WILLIAM LEPCHENSKI v. MOBILE & OHIO RAILROAD COMPANY, a Corporation, Appellant.—59 S. W. (2d) 610.

Division Two, March 3, 1933.

*R. P. & C. B. Williams* for appellant; *Carl Fox* of counsel.

*Douglass & Inman* and *Allen, Moser & Marsalek* for respondent.

HENWOOD, J.—This is an action, under the Federal Employers' Liability Act, for damages arising out of personal injuries received by plaintiff while in the employ of defendant. The trial resulted in

a verdict for plaintiff in the sum of $20,000. The trial court ordered a *remittitur* of $8,000, and, upon compliance with that order by plaintiff, set aside the original judgment and entered a new judgment for plaintiff in the sum of $12,000 and overruled defendant's motions for a new trial and in arrest of judgment. Defendant then appealed in due course.

UNDISPUTED FACTS.

Plaintiff was employed by defendant off and on for more than thirty years as a section hand on a section of defendant's main line track extending four miles north and two miles south of the town of Berkley, Kentucky. Defendant operated trains in interstate commerce over this part of its main line track, and both the plaintiff and defendant were engaged in interstate commerce at the time plaintiff was injured. The crew of which plaintiff was a member used a motor car propelled by a gasoline engine in traveling over this section of the track. Going north from Berkley for about one mile the track runs in a reverse curve, first to the northwest and then to the northeast, through deep cuts and across two trestles. The second trestle is about 100 feet long and about 35 feet above the ground at the highest point. The curve to the northeast begins about 200 feet north of this trestle and continues, in a deep cut through a hill, for about 800 or 900 feet. About 200 feet north of the north end of this curve is a station whistling board, one mile from Berkley. About a half or three-quarters of a mile north of this station whistling board is Gamble crossing, a road crossing. About 7:30 o'clock in the morning of April 1, 1927, the section crew, composed of the foreman, William Brock, and seven other men, including plaintiff, left Berkley on the motor car and started to Laketon, four miles north of Berkley, to lower a boiler at the pumping station there. Defendant's southbound passenger train No. 15, due at Berkley at 4:30 A. M., had not passed Berkley when the section crew started north from Berkley. They did not know this when they left Berkley. The station agent at Berkley was not expected to report for duty until eight A. M., and there were no telephones in Berkley. As the motor car was proceeding north, at a point about ten or twelve feet from the south end of the second trestle, defendant's southbound passenger train No. 15 came into view, around the curve and out of the deep cut through the hill, about 390 feet north of the north end of the trestle, running at a high rate of speed. At that instant plaintiff jumped off of the motor car, and in so doing received the injuries herein complained of. Some of the other section hands jumped off of the motor car at that time, and the others remained on the motor car as it was driven at increased speed across the trestle in an attempt to reach a vantage point for escape at the north end of the trestle, where they did escape by jumping from the motor car

immediately before it collided with the on-coming train. Brock, the foreman, stayed on the motor car and was killed in the collision. The hill or high embankment on the east side of the curve in the track obstructed the view of the train crew as the train moved south and the view of the section crew as the motor car moved north. The collision occurred at 7:42 A. M., about three-quarters of a mile from Berkley.

## THE PLEADINGS.

While plaintiff's petition contains other specifications of negligence, the case was submitted to the jury only on the alleged negligence of defendant "in failing to sound the whistle of the locomotive of said train when approaching said curve and at intervals while rounding said curve or give a timely and adequate warning of the approach of said train around the curve as was the rule and custom of defendant to do in running its trains around said curve at the time of and long prior to the plaintiff's injury."

Defendant's answer consists of a general denial of the allegations of the petition, a plea of assumption of risk, and a further plea that plaintiff's injuries were caused solely by his own negligence in permitting himself "to be driven in said motor car at said time and place at an excessive and negligent rate of speed and failed to take precautions to have and keep the said motor car under control and moving at such a rate of speed that the same could be slowed down or stopped upon the first appearance of danger."

Plaintiff's reply is a general denial of the allegations of the answer.

## ' PLAINTIFF'S EVIDENCE.

Plaintiff testified: "There was nothing said about train No. 15 by any member of the crew when we started north on that morning. I was always watching, looking and listening for trains before we got into these cuts, and we just run along and as we come out of this first long cut and crossed this bridge (the first trestle), and along this second curve we were just running along slowly, between ten and twelve miles (per hour). As we run out of the cut, a few feet before we got on the bridge (the second trestle), I looked around at the head of the car and saw the engine and says, 'Look out, boys,' and I jumped off. I jumped off right at the south end of the trestle. I went off a bank seven or eight feet high. I didn't know anything after I jumped, just went like a barrel turned loose down a hill. I heard no whistle whatever prior to the time I saw the train coming. I was listening and looking when we approached that trestle. The sun was shining, but there was a little wind that morning coming from the southwest. I would say, having in mind the amount of wind and the noise made by the motor car at the time of the accident and the condition of the track and the curves and hills at that place, I sort of believe a man could hear a whistle on that train while on that

motor car a quarter of a mile away. I could hear a train blow a whistle on that morning, considering the noise of the motor and the obstructions of the sounds from the blowing wind and the grinding of the rails, a quarter of a mile away. I believe I could have heard it if it had whistled at the whistling board. I had on other occasions before this noticed freight and passenger trains going along that track and past that curve and trestle. *Some whistle in the curve and some whistle before they got to the curve. I have noticed that all the time that I have been around the railroad track and when I was around in there and hear them whistling."* The deposition of Edgar Hayden, another member of the section crew, was taken and admitted in evidence on behalf of plaintiff. His testimony was substantially the same as that of plaintiff as to what happened at the time of the collision and immediately before. He further testified: "Prior to the time that I saw the train which collided with the motor car I had not heard any whistle or bell sounded by the train. We listen for trains when we start around a curve. We always listen. When it was time for a train it was our custom and practice always to stop. When we didn't know a train was due we generally coast on. It (the motor car) coasted around there just before we came to this bridge (the second trestle). The motor car makes very little noise when coasting or idling. When we got right close to the bridge (the second trestle) we put the gas on and got across and shut it off again. Under the conditions existing at the time of the accident I ought to have heard him (the engine whistle) a quarter of a mile away. There were no other means or method provided at the time the accident happened other than the whistling of the engine whereby the section men could know when the trains were approaching. We saw the train as soon as it was possible to see it, in view of the hill and curve at that place." Henry Henderson and William Collier testified that they saw the train about a quarter of a mile north of Gamble crossing and heard it whistle for that crossing, but did not hear it whistle again until after the collision. Henderson further testified that the train was running at the rate of sixty miles an hour when he saw it. Bud Perry testified: "Saw the train, heard it whistle and looked up and it was coming over the Gamble crossing. Continued to watch it on down to the time of the accident. Saw the hind end of the train when it stopped after the collision. From the time I heard the train whistle north of the Gamble crossing I noticed two short whistles just before they hit the motor car. Observed the speed of that passenger train as I saw it coming south before the accident and would judge from the time I saw it on down to the place of the accident it was running between fifty and sixty miles an hour." Elzie Hicks, a resident of Berkley, was examined as follows:

Direct Examination:

"Q. Mr. Hicks, have you been around the vicinity of that trestle on other occasions prior to the time of the accident? A. Yes, sir.

"Q. About how often would you be around there? A. Well, I was around there every once in awhile.

"Q. Did you observe trains passing through those trestles and around those curves? A. Yes, sir.

"Q. Did you observe what they did with reference to whistling in the vicinity of that trestle and curve? A. Yes, sir.

"Q. What did they do with reference to this particular trestle? A. *They whistled at that curve.*

"THE COURT: I understood you to say you always heard them there whistle at that curve. A. *All the time I ever noticed them they whistled all along at those curves.*"

Cross-Examination:

"Q. They whistled at the signal board north of the curve? A. *They whistled all along.*"

Willie Collier testified: "Live about hundred yards east from where the accident happened. Just before the train hit the car, heard two little whistles. About the time he blew these little whistles, he hit the car."

Further Direct Examination:

"Q. And where did the collision take place, what end of the trestle? A. On the north end. I lived around there, near that trestle, about seven years. *All trains I saw go through there always whistled all the way around there.*

"Q. Around where? A. *Around that curve.*"

Cross-Examination:

"Q. You say the station board, whistling board, was there and you don't know whether they whistled there? A. *They usually whistled all the way around there.*

"Q. You really don't know where they did whistle? A. Yes, sir, *all along there.*

"Q. Some would whistle and some wouldn't? A. *All I ever heard pass there whistled.*

"Q. Did you hear this one whistle April 1st, that morning just before the accident? A. Yes, sir.

"Q. It did whistle along there? A. It whistled up there, it sounded like somewhere about that crossing.

"Q. You say you don't know where it whistled after that? A. I only heard it two times.

"Q. The first time was at the Gamble crossing? A. It sounded to me.

"Q. Three-quarters of a mile north of that place? A. Yes, sir.

"Q. The next time you couldn't tell? A. I heard it whistle (two little whistles) and then heard this racket (the collision)."

### DEFENDANT'S EVIDENCE.

All of the train crew and two residents of the neighborhood testified that the engine whistled for Gamble crossing, north of the crossing, and that it whistled for Berkley station, at or near the station whistling board. Another resident of the neighborhood testified that he heard one long blast of the engine whistle—the whistle signal for stations—"up there towards Gamble crossing somewhere." The engineer and conductor of the train and two members of the section crew testified that it was not the custom or practice of defendant's enginemen to sound the whistle of engines when approaching curves or while going around curves, and the conductor further testified that "there was no whistle blown between the station signal board and the curve on that morning." Three members of the section crew testified that, because of the wind from the southwest and the noise made by the motor car, they could not have heard an engine whistle as far away as the station whistling board while they were moving north on the motor car the morning the collision occurred. The conductor said the train was running "about forty miles an hour," and the engineer said it was running "between forty-five and fifty miles an hour," and the fireman said it was running "forty-five or fifty miles an hour," as it approached the point of the collision. The engineer further testified, on direct examination: "The schedule speed is forty-eight miles an hour. We are not supposed to go over that." And he further testified, on cross-examination: "We can't exceed a speed of forty-eight miles an hour. That is the limit. I don't think I was running any more than forty-eight miles an hour. Rule 1313 was in effect at the time of the accident. That says forty-eight miles an hour." In connection with the direct examination of the roadmaster, the following rules of defendant, relating to section men, were admitted in evidence and read to the jury, on behalf of defendant:

"Rule 1262. They must keep themselves as well informed as is practicable as to how regular trains are running, what extra trains are on the road and when they may be expected; must closely observe all passing trains for classification signals; and must regulate their work, as far as is expedient, so as not to interfere with the passage of trains.

"Rule 1273. They must not allow their hand or push cars to be used for other purposes than the company's business, and only under their personal direction. They must see that they are clear of the main track at least fifteen minutes before the time of the first and second class trains; that they are run with great caution at all times; that they are not run in the wrong direction on double tracks, if it

can be avoided; that a constant lookout is kept for trains, and that where there is not a clear view of the track far enough to insure absolute safety, flagmen are sent out with stop signals to protect them; that when they are run at night a white light is displayed in front and a red light on the rear and that they are never attached to trains."

The witness testified that these rules were in effect at and before the time of the collision, and that they "apply the same" to the use of motor cars as to the use of hand cars and push cars.

### PLAINTIFF'S EVIDENCE.

In connection with the cross-examination of this witness, the following rule, relating to the speed of defendant's passenger trains, was admitted in evidence and read to the jury, on behalf of plaintiff and over the objection of defendant:

"Rule 1313. The speed of a passenger train will ordinarily be that of its schedule; but, in cases of delay, may be so moderately increased as in the judgment of the engineman and conductor will be safe and prudent, due consideration always being given to condition of track, weather and all the circumstances, but in no case must the speed exceed forty-eight miles per hour."

The witness testified that this rule was in effect on and before the time of the collision.

I. Contending that the demurrer to the evidence should have been sustained, counsel for defendant say, in their brief:

"There was no substantial evidence of the alleged custom to sound the whistle on the locomotive upon approaching the curve in question.

"There was no evidence that the alleged custom was intended to cover a class to which section men belonged.

There is no averment in the petition, nor was there any proof, that the plaintiff knew of and relied upon the alleged custom to warn as one of a class within its protection.

"The negligence of the plaintiff in permitting himself to be driven in the motor car up to the curve and cut where the view was obscured, a known and obvious place of danger, was the sole and only proximate cause of the injury.

"The section men, including the plaintiff, assumed the risk when they rode in the motor car in a place of obvious and known danger where the view was obscured, without stopping or flagging, fully knowing that the whistle of train No. 15, if blown at the curve, could not have been heard a safe distance away.

"The evidence shows incontestably that the section men, including the plaintiff, could not have heard the whistle if blown at the curve, and the negligence, therefore, if any, in failing to warn was not the cause of the injury."

In the companion case of Brock v. Mobile & Ohio Railroad Company, 330 Mo. 918, 51 S. W. (2d) 100, the pleadings and evidence were substantially the same as in this case, and these same contentions were discussed at length, in the light of the pleadings and evidence and controlling authorities, and ruled against defendant by Division One of this court. We fully agree with the reasoning of FERGUSON, C., the writer of the opinion in Brock's case, with reference to these contentions, and, accordingly, we hold in this case, as was held in that case, that the demurrer to the evidence was properly overruled.

II. It is urged that the trial court erred in admitting in evidence defendant's Rule 1313, relating to the speed of its passenger trains, and in permitting plaintiff's counsel to refer to the admitted speed of the train in question in his argument to the jury, and in refusing defendant's Instructions K and L, by which defendant sought to have withdrawn from the consideration of the jury the admitted speed of the train in question.

The provisions of defendant's Rule 1313, relating to the speed of its passenger trains, was first brought to the attention of the jury on the direct examination of the engineer of the train in question, one of defendant's witnesses, and he was cross-examined as to the provisions of said rule without objection by defendant. So, defendant is not in a position to complain of the subsequent admission of said rule in evidence. Moreover, the admission of said rule in evidence under such circumstances could not have been prejudicial to the defendant.

As to the argument complained of, the record shows the following:

"MR. INMAN: Here is the defendant, who has admitted it (the train in question) was going fifty miles an hour.

"MR. WILLIAMS: I object to any speed, Your Honor.

"MR. INMAN: I am discussing it in failure to give a warning.

"THE COURT: The objection is overruled."

It was proper for the jury to consider the admitted speed of the train as one of the circumstances under which the train was operated without giving a customary warning, in determining whether the failure to give such warning was negligence. Therefore, plaintiff's counsel was within his rights when he referred to the admitted speed of the train, in his argument to the jury, in connection with his discussion of the negligence of defendant in failing to give plaintiff a customary warning. [See Hunt v. C. B. & Q. Railroad Co., 303 Mo. 1. c. 129, 259 S. W. 1. c. 488.]

For the same reason, the trial court properly refused defendant's Instructions K and L, which, if given, would have withdrawn from

the consideration of the jury the admitted speed of the train in question. [See Hunt v. C. B. & Q. Railroad Co., supra.]

III. It is also urged that the trial court erred in refusing defendant's Instruction M and in modifying defendant's Instruction 10, which instructions follow:

## "INSTRUCTION M.

"The court instructs the jury that the train crew in charge of defendant's train No. 15 in operating the said train around the curve in question were justified in assuming that the section men, riding on the motor car in question, would take reasonable precautions for their own safety and protection and were not required to look out for them or anticipate their presence on the track."

## "INSTRUCTION 10 (AS MODIFIED).

"The court instructs the jury that the enginemen on train No. 15, in operating said train around the curve mentioned in the evidence, were entitled to a clear track so far as section men were concerned and owed no duty, *in the absence of a custom and practice to give a timely and sufficient warning of the approach of a train at and to the curve mentioned in evidence by sounding the whistle of the locomotive of their train in approaching said curve and at intervals while near or upon said curve,* to keep a lookout for the men, including the plaintiff, on the motor car in question, or to anticipate their presence on the track at the time and under the circumstances as shown by the evidence, but such enginemen were justified in assuming, *in the absence of said custom, if you so find,* that said section crew, including the plaintiff, would look out for their own protection against trains moving on defendant's track at said time and place."
(Italics indicate modification by the court.)

It is apparent at once that these instructions, as offered, ignored the issue of custom, that is, the question of whether it was the custom of the enginemen on train No. 15 to give a warning of the approach of said train to and on the curve mentioned in the evidence by sounding the whistle of the engine when said train approached said curve and at intervals while it was on said curve. And, for that reason, Instruction M was properly refused, and Instruction 10 was properly modified, it being so modified as not to ignore the issue of custom, in submitting to the jury the question of whether the enginemen on train No. 15 were under any duty to keep a lookout for the section men, including plaintiff, on the motor car, or to anticipate their presence on the track at the time and under the circumstances shown by the evidence. [See Hunt v. C. B. & Q. Railroad Co., supra, 303 Mo. l. c. 131, 259 S. W. l. c. 489.]

208

■ IV. Plaintiff's Instruction 1 is assailed on the grounds:

That it "is misleading and prejudicial, in that it made the delay of train No. 15 and plaintiff's want of knowledge thereof a predicate of liability;" that it "made it the duty of defendant's servants in charge of its trains to anticipate (the presence of) and look out for the section men, irrespective of whether there was a custom and practice so to do;" that it "submitted (the question of) plaintiff's reliance on said custom when there was no pleading or proof upon that subject;" that it "assumed that the whistle (of the engine), if sounded on approaching the curve and traversing it, would have operated as a warning of the approach of the train."

The lateness of train No. 15 and plaintiff's lack of knowledge thereof are constituent facts of plaintiff's cause of action, in that they support the allegations of plaintiff's petition that the enginemen on the train were negligent in failing to give plaintiff a customary warning and that said negligence was the proximate cause of plaintiff's injuries. And we are unable to see how the jury could have been misled or how defendant could have been harmed, by that part of plaintiff's Instruction 1 which required the jury to find that train No. 15 was late and that plaintiff did not know it was late, although these facts were included among the facts on which a verdict for plaintiff was predicated in the instruction.

Counsel for defendant are clearly wrong in asserting that the instruction "made it the duty of defendant's servants in charge of its trains to anticipate (the presence of) and look out for the section men, irrespective of whether there was a custom and practice to do so." On the contrary, the jury were required, by the instruction, to find "that the servants of defendant in charge of said train knew, or by the exercise of ordinary care would have known or should have anticipated, that plaintiff or other employees of defendant were likely to be riding upon and along said track on a motor car at a time when they would be unable to see the approach of said train on account of the curve and obstruction as aforesaid and in danger of being injured by said train, *and* that at said time and long prior thereto it was the custom and practice of the defendant to give a timely and adequate warning of the approach of a train at and to said curve by sounding the whistle of the locomotive of the train in approaching said curve and at intervals while near or upon said curve. . . ." (Italics ours.) And, in requiring the jury to find that the train crew knew of, or by the exercise of ordinary care would have known or should have anticipated, the presence of the section men at the time and place in question, plaintiff assumed an unnecessary burden, in the instruction, of which defendant cannot justly complain. [See Hunt v. C. B. & Q. Railroad Co., supra, 303 Mo. l. c. 128-129, 259 S. W. l. c. 488.]

■ The complaint that the instruction "submitted (the question of) plaintiff's reliance on said custom when there was no pleading or proof upon that subject" is necessarily disposed of by our ruling on the same complaint in connection with the demurrer to the evidence. [See discussion of this question in Brock's case, supra, 330 Mo. 918, 51 S. W. (2d) l. c. 104-106.]

The instruction required the jury to find that the train crew "failed to sound the signal at reasonably safe intervals while approaching and traversing said curve *so as to have warned plaintiff* of the approach of said train in time for him to have reached a place of safety, . . ." (Italics ours.) We do not agree with counsel for defendant in the contention that, by the words *"so as to have warned plaintiff,"* the instruction assumed that the whistle of the engine, if sounded, would have been heard by plaintiff. The words *"so as to have warned plaintiff"* related to the purpose, not the effectiveness, of the warning. Furthermore, the instruction required the jury to find "that the failure of said servants in charge of said train to sound the whistle as aforesaid, if you find they did so fail, was negligence which in whole or in part directly caused the injuries, if any, to plaintiff," and, manifestly, the jury could not have found that the failure to sound the whistle was the proximate cause, in whole or in part, of plaintiff's injuries, without finding that plaintiff would have heard the whistle if it had been sounded. [See Kidd v. C. R. I. & P. Railway Co., 310 Mo. l. c. 42, 43, 274 S. W. l. c. 1092, 1093.]

It follows that the criticisms of plaintiff's Instruction 1 are without merit.

■ V. It is finally contended that the excessive verdict was the result of passion and prejudice on the part of the jury, and that the judgment is still excessive, notwithstanding the *remittitur* made below.

"The argument that the jury's verdict shows passion and prejudice is not persuasive. . . . Juries have nothing except their ordinary experience as laymen to guide them in estimating damages in cases of this character. Indeed, our trial and appellate courts are not much better off in many instances. And this court has repeatedly held that an excessive verdict does not necessarily indicate improper motives on the part of the jury, and that where, as in this case, there is no substantial basis for the charge of passion and prejudice, and the plaintiff consents to a reasonable *remittitur,* the defendant cannot justly complain, even though the judgment is based upon an excessive verdict." [Dees v. Skrainka Construction Co., 320 Mo. l. c. 851, 852, 8 S. W. (2d) l. c. 878, 879.]

Plaintiff's brief contains a fair statement of the evidence adduced by him relating to his injuries and his pecuniary loss resulting therefrom. Said statement (allowing for alterations) follows:

"Plaintiff was fifty-five years of age at the time of the trial. The accident occurred about a year previous. He was earning $2.00 a day, working six days a week, and occasionally on Sunday. He suffered injuries to his right hand and wrist, his right shoulder, and the right side of his chest. The right wrist was fractured. The fingers of the right hand became greatly swollen. The right chest and right shoulder were sore and painful. Plaintiff testified: He had not been free from pain in his chest and shoulder from the day of the accident until the day of trial. His wrist, arm and hand remained sore. He could not use the wrist, could not grip anything with the hand and could not close the little finger of the hand against the palm. His hand became numb, and he had no strength in it, and if he attempted to use it it became swollen. The condition of his right chest and shoulder prevented him from using his arm. He could not raise his arm to the level of his shoulder. He had suffered much pain as a result of the accident, and was unable to sleep at night. He could not lie on his right side, and had to do all his sleeping on his back and left side. He had been unable to do any work from the time of the accident until about two months previous to the trial. He then got a job of watching hogs, for which he received a dollar a day and board. He had made a total of about $75 since the accident.

"Dr. A. C. Vickery testified: He examined plaintiff on August 16, 1927, and again on May 12, 1928. He found that the muscles of plaintiff's shoulder had atrophied or shrunk. He found an abnormality in plaintiff's right chest. There was an increased tension of the soft tissues. From his examination and the history of the case he concluded that plaintiff's pleura was thickened. The right chest did not move as high as the left when plaintiff breathed. This was a condition called lagging, due to adhesions in the chest, interfering with the action of the lung. His examination of plaintiff's right wrist showed evidence of a fracture of the lower end of the radius, and that the radius was shoved down, out of its normal position, about a half inch. This condition disturbed the relationship between the two bones, and caused a loss of gripping power. He found that plaintiff was suffering from a chronic inflammation of the shoulder joint, and that this condition, together with the thickening of the pleura, was attributable to injury. The condition of the chest, shoulder and right wrist are permanent, and will cause pain in the future.

"Dr. George W. Flynn, who examined plaintiff on May 5, 1928, testified: 'The injuries I found were confined to the right side of the body. The objective symptoms were in the right wrist, the

metacarpal bones, the bones that run from the knuckles to the wrist. There was a fusion of two of the bones, the index and middle finger bones. They were fused together near the wrist, showing an impacted fracture at the right metacarpal bone. . . . There is some outward displacement shown in the picture in the radius bone from its normal position. . . . I also found some injury to the right shoulder and thickening in the pleura on the right side and front of the chest. It extended to the apex of the lung. It was an inflammatory condition and probably trauma, and adhesions and thickening in the right shoulder joint. It showed an impairment in that joint. It was not a diseased condition, but had the appearance of trauma. . . . It was a traumatic condition. By that I mean injury. There were some adhesions in the shoulder joint that limits the movement of the shoulder joint. When you moved the shoulder you could see with the fluoroscope an impairment in the movement. The condition of the lung and adhesions about the pleura will interfere with the breathing.' This witness further testified that there was some impingement of the nerves of the right wrist and hand which condition will permanently impair the use of the hand, and that the shoulder and chest conditions are also permanent."

Ordinarily, we are inclined to defer to the discretion of the trial court in the matter of *remittiturs* in cases of excessive verdicts. However, we are not satisfied that we should do so in this instance. Considering plaintiff's age and earning capacity at the time he was injured, the nature and extent of his injuries, and the pecuniary losses that he has already suffered and will probably suffer in the future as the result of his injuries, we think the judgment is still excessive by $3,000. [See Sullivan v. St. L.-S. F. Railway Co., 321 Mo. 697, 12 S. W. (2d) 735; Morris v. Atlas Portland Cement Co., 323 Mo. 307, 19 S. W. (2d) 865; Dees v. Skrainka Construction Co., supra.]

If plaintiff will file a *remittitur* of $3,000 in the office of the clerk of this court within ten days after the filing of this opinion, the judgment will stand affirmed for the sum of $9,000, with interest thereon from the date of its rendition; otherwise the judgment will stand reversed and the cause remanded. All concur.