GOTTLIEB WELLINGER v. TERMINAL RAILROAD ASSOCIATION OF ST. LOUIS, a Corporation, Appellant. No. 39177.—183 S. W. (2d) 908.

Division One, November 6, 1944.

Rehearing Denied, December 4, 1944.

*Joseph A. McClain, Jr.,* and *Arnot L. Sheppard* for appellant.

*Max C. Nelson* and *Chelsea O. Inman* for respondent.

674

VAN OSDOL, C.—Action under the Federal Employers' Liability Act, Title 45, U. S. C. A., sec. 51 et seq. The jury returned a verdict for $15,000, and defendant appealed from the judgment rendered. Plaintiff (respondent), a mail handler in the employ of defendant (appellant), fell from a four-wheeled mail or baggage truck from which he had loaded pouches of mail into a mail car in an interstate train at Union Station in St. Louis.

Plaintiff alleged that, when he was in the act of getting off the mail truck, the side of the truck gave way throwing him to the ground and causing him to suffer permanent injuries. The plaintiff specifically alleged,

"It is the duty of the defendant to furnish plaintiff a reasonably safe truck with which to haul the mail from trains and to trains, yet the defendant negligently furnished plaintiff a truck not reasonably safe with which the plaintiff could do his work, and that the truck and parts thereof were worn, weak, insecure, defective, insufficient, and unsafe, and as a direct result of the defective, unsafe and dangerous condition of said mail truck, plaintiff suffered the injuries as hereinafter alleged."

Defendant's answer contained a general denial, and pleas of assumption of risk of an obvious danger and contributory negligence.

Defendant assigns errors of the trial court, (1) in submitting plaintiff's cause to the jury, and (2) in giving an instruction. And defendant contends (3) the verdict was excessive.

Plaintiff had been in the employ of defendant for several years and had worked as a mail or baggage handler throughout the employment. The truck, used by plaintiff when he was injured, was propelled by hand; was approximately six feet in length, and three and one-half feet in width; its flat platform was two feet, eight and one-half inches high. Iron frames, projecting above the platform were constructed on either end of the truck. The posts of each iron frame were fitted through the platform; the posts were of iron pipe and they,

and the crossbar of a frame, were one continuous pipe of iron shaped in a ''rounding curve'' at the upper corners of the frame. Each frame was supported by two other iron pipes welded into the crossbar between the posts and projecting downwardly through the platform. Two upright hooks, angle irons, or slots were welded to the outer side of each outside or end post of each frame, one about one foot and the other about two and one-half feet above the platform. The slots were made to support wooden side bars, two on either side of the truck and extending its full length. The upper side bars, when placed in their slots, were about six inches lower than the tops of the frames. Each side bar was loosely chained to the end posts of the frames, the chains being attached about two inches from the ends of the side bars with a clevis. When the side bars were removed from the upright slots the chains retained the side bars in a loose position below the platform of the truck. The side bars and the frames were constructed for the primary purpose of retaining mail pouches and parcels of baggage upon the platform of the truck.

On the morning plaintiff was injured, the side bars had been placed in the slots, and the truck had been ''normally'' loaded with mail; the truck had been moved to a location where its left side was alongside and against a mail car, and plaintiff had handled the mail pouches from the truck into the car. He then stepped to the right and to a position on the platform of the truck about two feet from the front frame—''I (plaintiff) go to get out of the truck. When I unload the truck I turn around to get hold of the side stick (bar) on the right. So, as soon as I put my hand on it and put a little pressure on it at the bottom with my foot, I lift my leg (to step over the side bar) and the front give way, and this side dropped down, out, and before I noticed him, I go down with the side sticks, head down, and the side sticks hang sideways, and the bottom stick throwed me up in the air, you know, and you see it turned me upside down, and I go head down to the concrete, and the seconds I fell, I stretched my right hand to protect the head, I stretched him out to save me from hitting the head on the concrete, and then I went down, and had to turn over and give me a lift with my left hand, to get up.'' The rear end of the upper side bar and both ends of the lower side bar remained within the slots. Plaintiff testified that, ''after the train pulled out,'' he observed the metal of the upper hook on the right of the front end frame had been ''bent to the front . . . I don't know when it is bent.''

We can safely say the evidence showed the truck was an old one, and the end frames were rather rickety. The end frames were no longer firmly fixed at the points where the iron pipes passed through the platform. It seems that the end frames had become so loosened that they swayed ''something about an inch or less, or two inches,'' at the tops. There was evidence that the frames had been in this con-

dition for "a year or so." It may be reasonably inferred that the looseness of the frames permitted them to "spread" (the front frame "moved to the front") so that the upper right side bar slipped from its slot in the front frame, "dropped down, out," causing the plaintiff to fall; although it could be reasonably inferred that plaintiff's tripping over the lower right side bar (as he fell) threw his body over to such a degree that the force of his fall was sustained by his upper body.

(1) Defendant asserts there was no submissible case for the reason plaintiff's evidence shows "no proximal causal negligence of defendant." It is urged that the side bars were provided for the sole purpose of preventing mail pouches or baggage from falling off the truck; that defendant fulfilled its obligation if the side bars were sufficient (it does not appear that they were not) for that purpose; and that it did not appear from the evidence that defendant had a duty to keep the side bars secure with reference to their use in alighting from the truck, especially since the evidence was insufficient in showing that the use of the side bars in alighting from the truck was established by custom, uniform, universal, certain and reasonable, and known to defendant and acquiesced in by it.

It is a general principle that a master has the duty to provide a servant with reasonably safe appliances. There is a qualification of the principle, however—it is universally agreed that a master is not liable for a breach of this duty where the servant's injury was not caused by any defect in the appliance provided by the master which affected its safety when used in the ordinary manner and for the purposes for which it was intended. Labatt's Master and Servant, 2d Ed., Vol. 3, sec. 921; Kelley v. Lawrence, 195 Mo. 75, 92 S. W. 1158; York v. Kansas City, C. & S. Ry. Co., 117 Mo. 405, 22 S. W. 1081.

It would be unjust to require a master to answer for an injury in a case (1) where the emergency which tested the instrumentality arose out of an occurrence which implied no culpability on his part, or in a case (2) where the plaintiff (or a coemployee) caused the injury "by putting some part of the plant to an absolutely improper use.

. . .

"The propriety of the limitation (or qualification), viewed as a rule of law, excluding the intervention of a jury altogether, does not seem to be equally beyond dispute in a third class of cases, viz., those in which the circumstances which eventuated in disaster were brought about by an act of the injured person which was perfectly proper in itself, and not improbable, or even very probable under the circumstances. It is difficult to admit that the elements thus involved present a situation which, in every instance, will justify a court in declaring that the master was not bound to make such arrangements as would have obviated the accident. Such a declaration may be per-

missible where the servant's act, if not positively negligent, was one which he could not have been reasonably expected to commit, inasmuch as there was an alternative and safe course open to him.

"But it is impossible not to feel some doubt as to the correctness of the decisions which virtually amount to an affirmation of the doctrine that a master's duty is fulfilled if his instrumentalities are reasonably safe for one special and primary purpose, although the work which he assigns to his servants may render it absolutely necessary to use them for other purposes as well, . . . " Sec. 921, Labatt's Master and Servant, supra.

The question of whether the use is within the meaning of the qualification of the general principle may be broadly resolved—was there really a diversion of the instrumentality from the purpose for which it was intended? Sec. 921, Labatt's Master and Servant, supra.

In cases cited by appellant there were uses which were, without question, diversions of the various instrumentalities from the purposes for which they were intended (and there was no showing that the uses were for purposes customarily made of the instrumentalities by the servant with the ▉▉▉▉ knowledge and consent of the masters). Manche v. St. Louis Basket & Box Co. (Mo. Sup.), 262 S. W. 1021; Kelley v. Lawrence, supra; York v. Kansas City, C. & S. Ry. Co., supra; McClain v. Seaboard Air Line Ry. Co., 34 Ga. App. 86, 129 S. E. 876; Campbell v. Southern Pac. Co., 120 Ore. Sup. 122, 250 P. 622; McCauley v. Southern Railway Co., 10 App. D. C. 560; Graham v. Chicago, St. P., M. & O. Ry. Co., 62 F. 896. Or the instrumentality was not only improper for the novel use, but, from the nature of the instrumentality, it could not have been made safe for such use. Freeman v. Garretts (Tex. Sup.), 196 S. W. 506. In these cases it was held as a matter of law that the servant could not recover.

▉▉ A master's acquiescence in a use for some purpose, other than that for which it was intended, places him in a position as if the used appliance had been furnished to use for the purpose. Labatt's Master and Servant, 2d Ed., Vol. 3, sec. 923; McCaffrey v. Tamm Bros. Glue Co., 143 Mo. App. 24, 123 S. W. 944; Brimer v. Chicago, B. & Q. R. Co., 109 Mo. App. 493, 85 S. W. 653.

▉▉ Plaintiff was engaged in the performance of his duties when hurt. His duties were to handle mail pouches in the loading and unloading of mail on and off mail cars in trains. An appliance, a *truck* with side bars, had been furnished by defendant for plaintiff's use in the performance of his duties. Plaintiff's duties required him to be upon the platform of the truck that he might load the mail pouches from the truck into the mail car. When he had finished that task he was expected to alight from the truck and pull it clear of the train. So he had to get on and off the truck in the performance of his duties. No special means of getting on and off the truck had been provided by

defendant. Plaintiff did not have to climb over the side bars; he could have let them down and jumped, slid, climbed or vaulted off the truck. It does not appear that defendant had instructed plaintiff that he should let down the side bars when, having unloaded mail sacks or baggage, he alighted from the·truck; nor had defendant, it seems, instructed plaintiff of any other method of getting on or off the truck. It is reasonable, from the nature of the tasks mail handlers were expected to perform, that defendant should have anticipated that plaintiff and defendant's other employees in using the truck would use such means as were available in getting on and off. It would seem that "straddling" over the side bars and holding on to them with the hands to steady the body as one got off the truck would be a convenient, quick and natural means of getting off the truck (the upper side bars were lower than the frames at the ends of the truck). It could reasonably be considered that availing of such a convenient, quick and natural means should have ·been reasonably expected, especially since the duties of a mail or baggage handler would frequently necessitate an expeditious clearing of the way for the departure of a train, as was the case when the plaintiff sustained his injury.

Moreover, it was the testimony of plaintiff that he was alighting from the truck as he had on other occasions; that "everybody used them (the side bars) that way that worked around there." One of plaintiff's fellow workmen testified that he "got down different ways; sometimes climbed over the end, back end or front end; sometimes over the side; sometimes the bar would be down, and I would jump over; I got off in different ways." He "quite often" alighted from the truck by climbing over the side bars; the practice of so dismounting from the truck had gone on since "a truck of that description has been in use." On one occasion the side bars had given way when he was climbing over them. He had seen others get off the truck in a good many ways.

It has been seen from the evidence that the manner in which plaintiff dismounted at the time he sustained injury was a practice of the employees of defendant (a practice not uniform, it is true); we infer the practice was varied as different conditions confronted a particular handler as he found himself in different positions on the truck at the times when his duties prompted him to dismount from the truck. It appears that the usual or customary practice, when the side bars were up, was to use (in alighting) that part of the truck's super-framework ("quite often" the side bars) as was most readily available at the time. The practice had continued during the time a truck (of the description of the one involved herein) had been in use. From the length of time the practice had "gone on," defendant must have known of the practice and, not having forbidden the practice, must have consented to it. The practice with which we treat in the case at bar was not a custom in the sense of a custom or

usage of a particular ▮▮▮ trade or locality which might have been required to be pleaded, and proved to be certain and uniform. It is said that a servant working for a master is engaged in the same business as the master and that as between them a custom need not be proven with such fullness as would make it a rule of the common law. O'Donnell v. Baltimore & O. R. Co., 324 Mo. 1097, 26 S. W. 2d 929; St. Louis & S. F. Ry. Co. v. Jeffries, 276 F. 73. The proof of a practice of defendant's servants (and acquiescence in the practice by defendant) was evidentiary support of plaintiff's allegation of defendant's negligence in failing to furnish plaintiff with a reasonably safe appliance; it could be considered reasonable, under the circumstances, that defendant, in the exercise of ordinary care, had the duty to take a precaution against the dangers attending the practice known to defendant and to which it had consented.

In our opinion, we should not hold, as a matter of law, that there was a diversion of the instrumentality from the purpose for which it was intended within the meaning of the qualification of the general principle which we have mentioned supra. Although the primary purpose of the side bars was to retain mail pouches and parcels of baggage upon the platform of the truck, the use of the side bars in alighting should have been anticipated as a convenient, expedient and natural means of getting off the truck. And, in view of the evidence of the practice of defendant's employees which defendant must have known, we believe the plaintiff's case was clearly submissible to a jury.

▮▮ (2) It is contended that the trial court erred in giving Instruction Number 1 at the instance of plaintiff. This instruction directed a verdict for plaintiff if the plaintiff "was alighting (from the truck) in the usual and customary manner, and that while so doing the front end-frame of said truck moved forward, thus causing the upper right side-rail to give way and slip from the hook on which it was resting, . . . ; and if you further find that at the time said front end-frame and side-rail were loose and insecure and likely to move and give way . . . and that by reason of said conditions . . . said truck was not reasonably safe for the use of defendant's employees in alighting therefrom . . . ; and if you further find and believe from the evidence that it was negligence on the part of defendant to furnish plaintiff said truck in said condition, . . ."

It is said by defendant that the instruction is without the purview both of the pleadings and the evidence in violation of the rule of the case of Degonia v. St. Louis, I. M. & S. R. Co., 224 Mo. 564, 123 S. W. 807. See also State ex rel. Central Coal & Coke Co. v. Ellison, 270 Mo. 645, 195 S. W. 722. Defendant argues that plaintiff had alleged no "technical" local custom, and so must now rely upon an "evidentiary" custom, and the jury should have been advised of the facts which would have been proof of such a custom. As we understand defendant's position, it is that the instruction is erroneous in

failing to hypothesize to the jury that the defendant knew of and acquiesced in the practice of its employees in alighting from the truck. Moreover, defendant urges, there was no evidence tending to show defendant's knowledge of any custom of plaintiff or his fellow employees to alight from the truck by the method used by the plaintiff at the time of his injury. We have hereinbefore ruled that, because of the length of time the practice of the employees of defendant had "gone on," it could have been reasonably found that the defendant should have known of such a practice; and it has been uniformly held that a finding that defendant, under a hypothesized statement of facts, failed to exercise ordinary care and was guilty of negligence is equivalent to a finding that defendant knew or should have known of facts and conditions hypothesized in the instruction. See Simmons v. K. C. Jockey Club, 334 Mo. 99, 66 S. W. 2d 119, and cases therein cited.

If the jury found that defendant was negligent in failing to provide a reasonably safe appliance, and that plaintiff was using it in the usual and customary manner, the jury must have found that the defendant knew of the practice of plaintiff and his fellow servants in the use of the appliance.

(3) It is contended that the amount of the jury's award is excessive. Plaintiff at the time of trial was fifty-eight years old, earning seven dollars per day; he had lost approximately $4676 in wages as a result of his injuries. He is now (at the time of trial) employed by defendant at the general increases in pay over that he received prior to his injury; he drives a tractor in hauling trucks of baggage and mail, a duty which requires no heavy lifting. He is frequently compelled to "lay off" because of pain. His right arm, shoulder, neck and back get sore; the aching does not let him rest. It was the testimony of a physician that plaintiff suffered with an injury to or disturbance of the brachial plexus—the trunk or network of nerves which emerges from the neck and, dispersing, supplies energy to the muscles of the shoulder and arm. Hospital records record, "Patient has a cervical arthritis, with a brachial plexus neuritis." There is an inability to raise the right arm above the horizontal without extreme pain; the right shoulder seems to be sunk somewhat lower than the left; there is some impairment and atrophy of the muscles of the right shoulder; the grip of the right hand is of less strength than that of the left; there is a disturbance of the sensation of the entire right side. Surgical correction is problematical. The physician was of the opinion that plaintiff's physical condition would not improve.

Defendant has cited the cases of O'Brien v. Rindskopf, 334 Mo. 1233, 70 S. W. 2d 1085; Jenkins v. Mo. State Life Ins. Co., 334 Mo. 941, 69 S. W. 2d 666; and Lepchenski v. Mobile & O. R. Co., 332 Mo. 194, 59 S. W. 2d 610, in which verdicts substantially less in amount

than that of the instant case were held adequate for injuries in some respects similar in nature and extent. Plaintiff's injury has continued to be painful, and it is reasonably expected that he will continue to suffer pain in the future. It is probable that his physical condition will not improve. Plaintiff has lost more in earnings than was shown to have been lost in the cases cited by defendant. But, although he cannot now attend to his duties with the same regularity, plaintiff continues to receive the wage, as generally increased, as prior to his injury. We consider the injury of plaintiff to have been no more grave as to pain and extent of impairment of his capacity to labor as the injury suffered by plaintiff in the case of Taylor v. Lumaghi Coal Co., 352 Mo. 1212, 181 S. W. 2d 536, and we hold the award in the case at bar to be excessive to the extent of $5000.

If plaintiff will within ten days enter a remittitur of $5000, as of the date of judgment, the judgment of the trial court will be affirmed for $10,000; otherwise, the judgment will be reversed and the cause remanded.

It is so ordered. *Bradley* and *Dalton, CC.*, concur.

PER CURIAM:—The foregoing opinion by VAN OSDOL, C., is adopted as the opinion of the court. All the judges concur.