THELMA MALONE, Administratrix of the Estate of FRED W. MALONE, Deceased, Respondent, v. HENRY A. GARDNER, Trustee of and for the Alton Railroad Company, a Corporation, Appellant, No. 41923—242 S. W. (2d) 516.

Court en Banc, October 8, 1951.

570

*Charles M. Miller* for appellant.

*Ben W. Swofford, Robert A. Schroeder* and *Lee E. Weeks* for respondent; *Swofford, Schroeder & Shankland* and *Stanley, Stanley, Schroeder, Weeks & Thomas* of counsel.

VAN OSDOL, C.—The administratrix instituted this action in damages under the Federal Employers' Liability Act (45 U. S. C. A., § 51 et seq.) for the death of her decedent, Fred W. Malone, who was fatally injured while working for defendant as a hostler at defendant's roundhouse and yards in Kansas City. It is plaintiff's theory that the death of her decedent was the result of falling from the top of an engine used in heating defendant's roundhouse. Defendant has appealed from a judgment upon verdict for plaintiff awarding $22,000 damages.

Herein upon appeal defendant-appellant contends plaintiff did not make out a submissible case, and the trial court erred in overruling defendant's motion for a directed verdict. And defendant-appellant assigns further errors of the trial court in the giving and in the refusal of instructions; in allowing plaintiff to impeach her own witness; and in the admission of evidence.

Fred W. Malone, 28 years old, in good health, had worked for some months for defendant as a switch-engine fireman and, a little over a month before his death, had become a hostler with the duty of running engines in and out of defendant's roundhouse.

Defendant's roundhouse of ten stalls was heated by steam generated in a small switch engine which was made stationary in stall number 7. The switch engine, sometimes called the "goat," was moved once daily from its stationary position to the ashpit outside the roundhouse where the engine was serviced by "knocking" the clinkers, grate cleaning and refueling, after which it was returned to its stall in the roundhouse and again made stationary by chocking the wheels.

The steam generated in the switch engine passed from the steam dome above the boiler into a heat-radiating system located near the

ceiling of the roundhouse. The engine was connected with the heat-radiating system by a pipe 1¼ inches in diameter projecting 6 inches upwardly from the steam dome. This pipe was connected with another pipe by means of a swivel union drifting toward the left of the engine; another pipe, about 17 inches in length, extended horizontally toward the front of the engine and connected with another union and ell, and yet another pipe extended vertically and connected with the heat radiation pipes near the ceiling.

When the engine was taken out of the roundhouse, it was necessary to remove a water hose from the water tender at the rear of the engine; one hand valve down near the top of the steam dome was used to shut off the steam from the engine, and another hand valve up nearer the ceiling was used to seal off the steam in the radiation system; the steampipe was then disengaged at or by one of the swivel unions, and the chocks were removed from the wheels of the engine, thus permitting the engine to be moved out of the stall and roundhouse free of all connection with the radiation system. After servicing, the engine was returned to stall 7, the wheels rechocked, the engine being again made stationary; and the water hose was replaced in the water tender. Of course it was necessary to again connect the engine with the radiation system for heating service by re-engaging the steampipe connection and by opening the hand valves above and below the connection. A wrench was used in disengaging or re-engaging the threaded connection.

The top of the boiler of the engine was 10 or 12 feet from the ground or floor of the roundhouse, and the steam dome extended its height 1 ½ to 2 feet above the top of the boiler. Running boards or "catwalks" were fixed along the sides of the engine and above the engine's drive wheels. The running boards were used by defendant's employees in repairing and servicing the engine; and iron handrails about 1 inch in diameter extended along the sides of the boiler, being bracketed to the boiler at points somewhat below the top of the curved or rounded body of the boiler. An air pump was set on the left side of the engine about even with and below the steam dome, and the running board on the left side of the engine "stepped up" about 18 inches in passing over the air-pump apparatus.

When employees were proceeding to disconnect or to reconnect the steampipe connection, they usually went up on the front of the engine and passed back along the running board until they reached a point near and below the steam dome, or they gained access to the running board by passing out through the opening in the front of the cab. Then the employee would "get hold of the steam dome, pull myself up, brace one foot on the handrail, and my knee on the steam dome." Sometimes the employee would stand upon the upper surface of the boiler. In reaching the connection and valves, the employee had to lean over toward the left side of the engine. The steam-

pipe was then disengaged, or re-engaged, by the employee; this required the use of both hands.

Plaintiff's decedent was on duty during the morning shift, 12 midnight to 8:00 a. m., the day of his death. The engine was usually given fire "knocking" service during that shift. At about four o'clock that morning, the steampipe was disengaged and plaintiff's decedent moved the engine out of the roundhouse for fire knocking, being assisted in this movement by Manley, the hostler's helper. Anticipating this movement, the steampipe had been disengaged either by plaintiff's decedent or by one Narron, machinist's helper. When the engine was moved back into the roundhouse, plaintiff's decedent put the hose back into the water tender to the rear of the engine, and was "standing on top of the tender headed toward the engine," when Manley closed the roundhouse door and started back toward the turntable in the yards. At this moment Manley heard the "noise of a man hollering." When plaintiff's decedent was found, he was five or six feet from the left side of the engine. He was "down on the ground about even with the steam dome and air pump." He was unconscious and bleeding at the mouth. He died within a few minutes.

The steampipe connection had not been re-engaged. There was a little mark on the side of the pump, it "was just like you rub a rag over a dirty place." There were some marks up around the steam dome, "they were just marks in the grime that settles on a locomotive around the steam dome - - - and there were some marks down from the steam dome." There was a "wrench or something lying up there - - - and there was blood down (on the ground) opposite right from the steam dome, and his cap was laying down there."

Plaintiff alleged, and the trial court submitted to the jury, the negligence of defendant in failing to provide plaintiff's decedent with a reasonably safe place to work, such negligence being pleaded and submitted by allegations and hypotheses that the engine was "slick, dirty and greasy"; that defendant had failed to provide "a ▓▓▓ suitable and adequate ladder, platform, or other tool or device with and whereby he could have reached said connection as described in evidence without climbing upon said engine"; and that defendant had failed to provide a means "of making said connection between the pipe on said engine and said overhead pipe - - - so that said connection could have been made by deceased and others from the ground level." These several particularized submissions of the negligence of defendant in failing to provide plaintiff with a reasonably safe place to work were submitted in the conjunctive. Defendant-appellant asserts the evidence was insufficient to sustain any of the particularized submissions, and error is assigned in plaintiff's Instruction No. 1 because of the hypotheses of these specified faults and also in the refusal of defendant's requested instructions withdrawing each and all of the specific submissions from the jury.

Defendant-appellant urges there was no evidence from which it could be reasonably inferred the deceased fell from the top of the engine,—"no one saw him fall, and if he did fall, where he fell from," if he made the marks or scratches on and down from the steam dome and on the air pump in falling, "they could have been made in falling before he got to the top of the boiler," or others "may have made them in getting up on the boiler or in coming down"—how or what made them "is the merest conjecture"; and defendant-appellant asserts that, even had the evidence disclosed deceased was engaged in work in line with his duty and fell from the top of the engine, there was no substantial basis for a finding his fall was caused by any negligence of defendant. It is argued "there was nothing wrong with any part of this engine"; the running boards together with the iron handrails contemplated that employees would use them to keep the engine operating—there is no reason why deceased "could not have held on to them if such were needed to keep his balance." It is said the "safe place to work rule" does not apply under all conditions as in the case of "a person misstepping or losing his balance while moving on or over an engine."

In determining if there was sufficient evidence to justify a trial court's submission of a plaintiff's case to the jury, we consider the evidence from a standpoint favorable to plaintiff.

In Tatum v. Gulf, M. & O. R. Co., 359 Mo. 709, 223 S. W. 2d 418, this court stated that the question of the submissibility of a plaintiff's case in an action under the Federal Employers' Liability Act is to be approached in the light of the recent decisions of the Supreme Court of the United States. In recent cases the Supreme Court of the United States has said the Act does not make the employer the insurer of the safety of his employees; and the basis of the employer's liability is his negligence, not the fact that injuries occur. But it is the clear Congressional intent that, to the maximum extent proper, factual questions in actions arising under the Act should be left to the jury; that cases may not be taken from the jury merely because the question of liability is close or doubtful; that the jury has the right to make all reasonably possible inferences from such probative facts in the evidence as the jury chooses to accept; and that it is not the function of a court to search the record for conflicting circumstantial evidence in order to take the case away from a jury on the theory that the court gives equal support to inconsistent and uncertain inferences. Tiller v. Atlantic Coast Line R. Co., 318 U. S. 54, 63 S. Ct. 444; Bailey v. Central Vermont Ry., 319 U. S. 350, 63 S. Ct. 1062; Tennant v. Peoria & P. U. Ry. Co., 321 U. S. 29, 64 S. Ct. 409; Lavender v. Kurn, 327 U. S. 645, 66 S. Ct. 740; Ellis v. Union Pac. R. Co., 329 U. S. 649, 67 S. Ct. 598; Moore v. Chesapeake & O. R. Co., 340 U. S. 573, 71 S. Ct. 428; Louisville & N. R. Co. v. Botts, 8 Cir., 173 F. 2d 164; Tatum v. Gulf, M. & O. R. Co., supra.

■ One contention of defendant-appellant is—that, by the contracts of defendant with the various crafts, members of which crafts were employed at the roundhouse, the work of steam fitting had been assigned to steam fitters, and, in the absence of steam fitters at a given time, steam-fitting ■ work was assigned by the contracts to machinists or their helpers, and deceased, a hostler, was consequently not engaged in work in line of duty but was without the scope of his employment if he was making a steampipe connection at the time he was fatally injured. An examination of the contracts between defendant and the various crafts discloses no specific language forbidding a hostler from making steampipe connections, and no steam fitters were employed and present during this morning shift. There was also evidence that, in practice, hostlers disengaged and re-engaged the steam fitting in question—''there was quite a few hostlers down there and everyone worked that, disconnected or connected it.'' They did this in the presence of the foreman. The shown customary performance of the pipe-connecting operation by hostlers evidences the practical construction of the craft contracts by the employer and employee. There is justification for the conclusion deceased was within the scope of his employment. See Wiggins v. Powell, 5 Cir., 119 F. 2d 751; and compare Wellinger v. Terminal R. Ass'n. of St. Louis, 353 Mo. 670, 183 S. W. 2d 908.

■ In continuing our consideration of the contention plaintiff's case was erroneously submitted to the jury, we will briefly state evidence introduced relevant to the adequacy and safety of the footing provided for employees when they were disengaging or re-engaging the steampipe connection.

A hostler's shanty was outside the roundhouse. Hostlers went out there to get lubricants. In procuring oil, one ''would get oil on your shoes.'' The engine ''as a rule'' was dirty; the surface of the boiler ''was greasy, all of those engines are greasy and dirty looking.'' This engine did not get a regular ''clean-up job'' like the engines that went out on the road. Three witnesses (a hostler, a locomotive fireman, and the roundhouse foreman) stated the steampipes could have been so arranged that the disconnection and reconnection could have been made by one standing on the ground or floor of the roundhouse. Defendant-appellant contends these witnesses were not qualified to so testify. It is said the problem of making a connection down nearer the floor was one for expert opinion by a mechanical engineer schooled and experienced not only in mechanics but also in safety measures. We think the witnesses of practical experience with steam engines and with the very steam-heating plant herein involved were qualified upon this not too complicated problem in steampipe fitting. It does not take an expert in mechanical engineering or in safety measures to see the steampipe could have been extended down so it could have been reached from a lower level, and in such a position as to yet

provide clearance for the engine when disconnected and in motion, and for employees to pass safely along and over the engine when reconnected and stationary. Compare Tatum v. Gulf, M. & O. R. Co., supra; Lang v. J. C. Nichols Inv. Co., 227 Mo. App. 1123, 59 S. W. 2d 63. There was a ladder, ten feet in length, available in the roundhouse. By the use of the ladder one could get onto the running board and reach the boiler, but it would seem the ladder was used for working on "boiler jackets, and such as that"; it was not provided for the purpose of and was inadequate and unstable as a footing for connecting the steampipe in question, situate up above the boiler and steam dome. "I don't know whether you could slant it that much."

There is no probable theory other than that plaintiff's decedent was fatally injured by falling from some part of the engine or tender. As stated, when deceased was last seen before his fatal injury, he was standing on the water tender and facing toward the engine. There was one task remaining in order to again make the engine a part of the roundhouse heating system—that task was to re-engage the steampipe above the steam dome. There was no other of defendant's employees in the vicinity of the engine at the time. The most direct route from the water tender to the steampipe connection was down through the cab and onto the running board. It is of course possible, as defendant suggests, the deceased slipped and fell from the water tender and, being injured, crawled to the place on the roundhouse floor immediately under the steam dome where he was found by his fellow employees; or he may have fallen from the cab or from the running board. But his position when found and the fact that his fall was such as to quickly render him unconscious would tend to make it more probable he fell from some upper part of the engine. It is true the running board and handrail, as provided, seem adequate for the use of employees in the ordinary servicing and repair of the ordinary engine. But the employee, who had the duty peculiar to this very engine of disengaging or re-engaging the connection, was obliged to go on up above the running board and boiler. The adequacy of the running board and handrail may be in some measure indicatory deceased fell from some part of the engine other than the running board, and the inadequacy of the footing on top of the engine may be somewhat indicatory deceased fell from the top of the engine. This was no ordinary engine used in switching or pulling trains over defendant's lines. It was set apart and used in heating the roundhouse. As the evidence shows, it was to be serviced without the roundhouse at least once daily. And, in servicing, it was contemplated an employee would be required to go up on the top to disengage and again to re-engage the steampipe connection above the engine. No really stable footing was afforded for the employees in their performance of this duty. It seems to us it could be reasonably found the failure to

provide a reasonably safe place or footing for the performance of this duty was negligence.

As we have said, there was a customary duty in the circumstances, the next one to be performed, which would take plaintiff's decedent to a position high above the running board and put him on an insecure footing and in illy balanced posture; and, assuming he fell while he was in such position, the marks and scratches around and down from the steam dome and on the air pump, and the place where deceased and his cap were found are circumstantially in harmony with and give support to the assumption, even though there was no evidence the marks could not have been made by another or at another time. We are of the opinion it could be reasonably inferred from the stated circumstances that deceased fell and that he fell from the top of the engine and that he fell at least "in part" because of the defendant's failure to provide adequate footing or means whereby defendant's employees could have performed their duty of disengaging and re-engaging the steampipe connection in reasonable safety. We believe the trial court did not err in submitting plaintiff's case to the jury.

A further complaint is made relating to plaintiff's Instruction No. 1. The first paragraph of the instruction advised the jury as follows,

"- - - this case - - - is brought and being tried under the Federal Employers' Liability Act as passed and approved by the Congress - - - with relation to common carriers of freight and passengers for hire in interstate transportation and their employees connected with such transportation; that under and by virtue of said - - - Act the defendant - - - owed his agents, servants and employees the duty to exercise ordinary care to furnish them a reasonably safe place to work - - -."

Defendant-appellant says the paragraph was too broad in intendment, giving the jury a misunderstanding as to the application of the rule of law regarding a reasonably safe place to work. It is argued that the Federal Employers' Liability Act "says nothing about furnishing employees a reasonably safe place to work." We see nothing prejudicial in the quoted paragraph. It was prefatory or introductory; and narrowed "negligence," in all of the respects against which the Act protects, to the negligence alleged and submitted in the instant case, that is, negligence in failing to furnish a safe place to work. The Act does not specifically state the rule that it is the employer's duty to exercise reasonable or ordinary care in providing the employee with a reasonably safe place to work, but the Act makes the employer liable in damages resulting "in whole or in part" from his *negligence*. The rights which the Act creates are federal rights protected by federal rules, which federal rules have been largely fashioned from the common law, except as Congress has written into the Act different

standards. At common law, the duty of the employer to use reasonable care in furnishing his employees with a safe place to work was plain, and the failure to use such care is *negligence*. Bailey v. Central Vermont Ry., supra, and authorities therein cited. Due care contemplates the precautions commensurate with the dangers to be encountered in the circumstances or, as has been said by the Supreme Court of the United States in cases involving employers' requisite care in furnishing a safe place to work, "in all cases it is a question of the reasonableness of the care; reasonableness depending upon the danger attending the place or the machinery." Patton v. Texas & P. R. Co., 179 U. S. 658, 21 S. Ct. 275; Bailey v. Central Vermont Ry., supra.

■ Defendant-appellant complains that the trial court erroneously permitted plaintiff to impeach her own witness by the use of a written statement formerly made by the witness. The witness testified relating to three material facts at the trial, in effect differently than he had theretofore stated in his written statement. Plaintiff does not seem to have known, when she put the witness on the witness stand, that the witness would change the effect of his former statements. Prior to trial and after the witness had made the written statement, his deposition was taken by plaintiff. None of the answers of the witness upon deposition were such as would indicate the witness was inclined to change the effect of his former written statement. Plaintiff was justified in believing the witness, when testifying upon trial, would not change the effect of his former statements, at least as to material matters. It is a general rule that a party may not impeach his own witness. However, when a party is unexpectedly surprised or entrapped; and unfavorable, adverse evidence is given by his own witness, he may interrogate the witness relating to and introduce into evidence the previous contradictory statements of the witness. Crabtree v. Kurn, 351 Mo. 628, 173 S. W. 2d 851; Mooney v. Terminal R. Ass'n. of St. Louis, 352 Mo. 245, 176 S. W. 2d 605.

■ The trial court refused defendant's requested Instructions K and L. The refused Instruction K, if given, would have advised the jury that defendant was under no duty to furnish a safe place to work "if the unsafeness was inherent in the work itself; therefore, the Court further instructs you that if you believe from the evidence unsafeness was inherent in the work of connecting the steampipes in question then your verdict must be in favor of the defendant Gardner." And the refused Instruction L, had it been given, would have directed a verdict for defendant if the jury believed "from the evidence that the connecting of the pipes in question could be performed in safety by one exercising reasonable care in performing such work."

There was no error in refusing the two instructions, K and L. Instruction K did not hypothesize the negative of defendant's negligence and left room for the jury's conclusion deceased assumed the

risks of his employment (see Tiller v. Atlantic Coast Line R. Co., supra; 45 U. S. C. A., § 54) ; and Instruction L likewise in no way negatived defendant's negligence and so would have authorized a verdict for defendant had the jury considered the plaintiff guilty of contributory negligence, whereas ''contributory'' negligence in the instant case was not a defense, but was only to be taken into account by the jury in the diminution of damages in proportion to the amount of negligence attributable to the employee (45 U. S. C. A., § 53).

The judgment should be affirmed.

It is so ordered.

PER CURIAM:—The foregoing opinion by Van Osdol, C., is adopted as the opinion of the Court en Banc. All the judges concur, except Conkling, J., dissents.