Leslie M. SCNEDER, Respondent,

v.

WABASH RAILROAD COMPANY, a Corporation, Appellant.

No. 43976.

Supreme Court of Missouri.

Division No. 2.

Oct. 11, 1954.

Motion for Rehearing and to Transfer to Court en Banc Denied Nov. 8, 1954.

200

Ely & Ely, Wayne Ely, Alphonso H. Voorhees, St. Louis, for defendant-appellant.

Joseph H. Miller, Richard B. Elster, St. Louis, of counsel.

Hullverson & Richardson, St. Louis, for plaintiff-respondent.

DEW, Special Judge.

Plaintiff brought this action under the Federal Employers' Liability Act, 45 U.S. C.A. § 51 et seq., to recover damages for personal injuries claimed to have been sustained by him while performing services for the defendant. He recovered a verdict in the sum of $40,000. Defendant has appeal.

The pertinent allegations of the petition, in substance, are that plaintiff and defendant were at the time in question engaged in interstate commerce; that on November 12, 1951, plaintiff was employed by defendant as a machinist in the company yards in Moberly, Missouri. He was required to inspect and test a locomotive engine there located. It was situated outside and not inside a shed provided for engines, and it was raining at the time, and dark. While he was engaged in such duties he was caused to fall from the locomotive and was injured as a direct result of the negligence and carelessness of the defendant.

The petition further alleges that the defendant was negligent and careless in the following respects: A. That the defendant carelessly and negligently caused and directed plaintiff to work on the engine outside of the shop while it was dark and

raining, when the shop room and pits were then available, all in violation of defendant's Rule 44 for the protection of employees, which provided that employees would not be required to work on engines or cars outside of the shops during inclement weather if shop rooms or pits were available; B. That defendant was negligent and careless in ordering and directing, suffering and permitting plaintiff to work on such locomotive in the rain and in the dark, and failing to provide lights for said work; C. That the runway, pathway and walkway in and about the engine was wet and slippery and persons were likely to fall by reason thereof; D. Defendant was negligent and careless in ordering and directing plaintiff in his work, in which plaintiff in attempting to comply, would be likely to and did fall from the engine; E. Defendant negligently and carelessly failed to furnish sufficient help for said work in that plaintiff was required to carry tools from the locomotive which hampered his movements; F. Defendant was negligent and careless in assuring plaintiff that he could work with reasonable safety at said place, and failed and omitted inspection of said engine for the purpose of determining the working conditions thereof; G. Defendant negligently and carelessly failed to furnish plaintiff with a reasonably safe place to work by reason of all of the facts aforesaid. The petition alleges injuries claimed to have been sustained by plaintiff as a direct result of the aforesaid negligence and carelessness of the defendant, including loss of wages at the rate of $400 a month and future loss of earnings, together with obligations, present and future, for medical attention in the sum of $1,000, all in the total sum of $60,000, for which he prayed judgment.

By its answer defendant generally denied the allegations of liability contained in the petition and pleaded that plaintiff's injuries, if any, were sustained by reason of his own negligence, directly causing or contributing to cause such injuries.

The evidence of the plaintiff, so far as material to the points raised on this appeal, tended to show the facts related below. Plaintiff was 59 years old and had been in defendant's employ for 30 years. The injury occurred at 1:00 a.m. on November 12, 1951. On orders from their foreman, plaintiff and his helper were testing the "pop-off" or safety valves of two steam locomotives. This quarterly inspection was required by the Interstate Commerce Commission. Plaintiff had done this kind of work for 25 years. The two engines had been moved out of the roundhouse and placed in the open, where water was taken on and the engines made ready for the inspection of the safety valves. Pits were available in the roundhouse at the time. It was raining "mighty hard". The engine in question was placed at or near an overhead coal chute. On this chute were four ordinary light globes. The globes above the chute were so located that the light therefrom was blocked and did not shine on the engine on which plaintiff was working. They were also blackened with soot. One light above the engine was out at the time. This was usual, since it was suspended on a swinging wire in such a way that passing locomotives knocked against it and extinguished it. Both engines were emitting dense, black smoke, and the wind and rain blew over the place from which plaintiff fell.

Plaintiff had just completed testing the safety valves on the second engine. He had attached a gauge to a line on the outside of the boiler, which was checked with a gauge in the cab. Plaintiff's helper had built up the pressure and plaintiff had mounted the runway on the side of the boiler, where he had "popped" and adjusted the safety valves. While doing this, plaintiff held onto the handrail above the runway alongside the boiler. He carried tools consisting of a large Stillson wrench, two smaller wrenches, a bushing, and he had a flashlight in his right-hand overalls pocket. The runway was about fifteen inches wide, and for about twenty inches it was elevated to run over a pump located on the side of the boiler. Most engines of that type have elevated runways about four feet long over the pump.

The elevated runway is reached by a few steps on each end. When the job was completed, plaintiff hung his gauge on the handrail, intending to walk forward and throw his wrenches to the ground and to return for the gauge. With the wrenches in his hand he guided himself along the runway by the handrail, stepped upon the elevated portion of the runway over the pump; threw his Stillson wrench to the ground, reached for his flashlight in his pocket, and took a short step back the way he had come. He was unable to see where the short elevated portion of the runway over the pump ended because of the darkness, but thinking that it extended further, stepped off the elevated portion of the runway into the air, and at the same time his other foot slipped as he fell. He fell from the engine to a sloping concrete base of a water tower nearby, twisting his body and sustaining the injuries shown in evidence and hereinafter more particularly described.

In explaining the accident, plaintiff testified:

"Q. Mr. Scneder, when you fell from this running-board on this engine, you have already said that you missed your step and stepped into space? A. Yes, sir; stepped over the end of the running-board.

"Q. Can you tell us from what part of the running-board you stepped? Was it part of the pump? A. Yes, sir; yes, sir.

"Q. Did you step over the front end of that part of the running-board? A. Yes, sir.

"Q. I believe you have already testified it was so dark you couldn't see where you were walking. That's right, is it? A. I believe so.

"Q. Well, do you know? Was it so dark you couldn't see where you were walking? A. So dark you couldn't see the end of the running-board, that's right; that was right. * * *.

"Q. I will just ask it this way: Did you slip on the footboard at all? A. I believe I did slip on the footboard as I fell.

"Q. After you missed your step? A. As I stepped over and found I didn't have anything under my foot, why, I slipped back and those wrenches, that accounts for those wrenches being in the position they were. I threw them back over my head as I fell; otherwise they would have been on the ground." * * * "I didn't slip on the footboard, but just overstepped the end of the raised section, and there was nothing defective about the engine to cause my injury". * * * A. But the defects comes from the lighting. I overstepped, the cause of the injury was my overstepping on account of no light there.

"Q. There wasn't any defect in the engine itself? A. No; no defect in the engine, outside of being slick on top of there in the rain, pouring down rain. * * *

"Q. But the slipping was not what caused you to fall. It was the stepping over that caused you to fall? A. That was it, in total darkness, yes, sir."

When cross-examined about his failure to use his flashlight, which defendant claims was negligence and the sole cause of his fall and injuries, the plaintiff stated that as he started to get down from the engine his flashlight was in the right-hand trouser pocket of his overalls; he had used the flashlight in testing the valves; he had experienced no trouble in getting up to the place where he did the testing. He hung the eight pound gauge on the handrail when he was ready to go down. He kept in his right hand his other tools except the Stillson wrench, which he had thrown to the ground, and tried to hold onto the handrail; that when about to step down from the platform over the pump, he twisted his body and reached with his left hand around to get his flash-

light out of his right-hand overalls pocket; that the reason he reached for the flashlight with his left hand was because he had the wrenches in his right hand; that he knew of no reason why he could not have transferred the tools to his left hand to free his right hand. He said it was pitch dark, raining hard and that "I was reaching for the flashlight; just took a step over there and stepped over the edge of it"; that "I had those wrenches here (indicating) and went out to the end of the running-board and stepped where I thought it was and it was so dark you couldn't see a thing".

There was further evidence in plaintiff's behalf to the effect that he and others had complained to his superiors of being required to test valves in the open and in bad weather, but that such work had always been required outside of the roundhouse. Rule 44 of the working agreement stated that employees would not be required to work on engines and cars outside of the shops in inclement weather if shops or pits were available, except in certain emergencies. The evidence shows that the job in question was merely a regular or quarterly inspection required by law.

Over the objection of the defendant as to qualification of the witness, employees of the defendant testified in plaintiff's behalf that the work could have been done in the roundhouse when it was dark outside and the weather conditions bad. In substance they testified that it would have been entirely feasible and simple to cut holes or ventilators in the roof of the roundhouse and cover them with cupolas with louvers, to permit the steam to escape when the safety valves were "popped". On the other hand, witnesses for the defendant testified that the steam would be emitted with such force as to cause it to rebound from the roof and to settle back on the engine and men working on it, interfering with their work and causing them injuries, and that the openings in the roof would not be adequate or feasible to remove the escaping steam. Plaintiff testified that he had never seen a machinist "pop" the safety valves of a locomotive in the roundhouse, because the "procedure was to pop them outside". He had been on an engine when it "popped" while in the roundhouse and the steam would come back in sufficient quantity to prevent him from "seeing what you are doing".

At the close of all the evidence defendant moved for a directed verdict, which motion the court overruled.

■ Defendant's main brief contains a separate statements of 29 "Assignments of Error", in addition to its points relied on. A separate statement of "Assignments of Error" is no longer required and only adds to the time, labor, expense and space expended in appellant's brief. 42 V.A.M.S. Supreme Court Rule 1.08. The present rule requires only the "points relied on, which shall specify the allegations of error, with citation of authorities". Ambrose v. M. F. A. Co-operative Ass'n, Mo.Sup., 266 S.W.2d 647, 648.

■ Defendant's first point relied on is that the evidence proves plaintiff guilty of negligence which was the sole cause of his fall and injuries, and, therefore, defendant's motion for judgment should have been sustained. It is apparent that such motion would not lie if there was any competent evidence of any negligence of the defendant in the respects charged and submitted and which directly caused or contributed to cause plaintiff's fall and injury. The primary charge in the petition is that defendant negligently failed to provide the plaintiff a reasonably safe place to work. There was competent evidence that plaintiff was ordered by defendant's foreman to test the safety valves on the engine in question at the time and to do so out in the open, at or near midnight, when it was raining hard, was "almost pitch dark", and dense smoke emitting from the engines, and the light globes nearby were either out, smoked, or so blocked as to throw no adequate light on the place where plaintiff was required to work; that pits were available inside the roundhouse, where it was feasible to make

it reasonably safe for such work to be done, or that more adequate lights could and should have been supplied if done outside; that defendant knew of these conditions and sufficient facts were in evidence to submit to the jury whether, under such conditions, the defendant was negligent, as submitted, and if so, whether such negligence directly caused or contributed to cause plaintiff's fall and injuries. We cannot say, as a matter of law, that under the evidence plaintiff was quilty of negligence which was the sole, proximate cause of his fall and injuries.

Defendant's next point is that the court erred in admitting testimony over defendant's objection as to how the roundhouse could be reconstructed to permit the testing of safety valves therein, and in refusing to strike such testimony. As stated, some witnesses, fellow employees of the plaintiff, testified that openings could easily be made in the roof of the roundhouse to permit steam to escape if the testing of the valves were done inside instead of outside the roundhouse. This testimony was allowed over the objection of the defendant that the witnesses were not qualified as combustion engineers or otherwise experts on pressure of steam under various conditions. The trial court, speaking of the plaintiff as a witness on the question, said: "A man that works around engines for thirty years, like this man, ought to have some good practical judgment about smoke and steam". The plaintiff testified that he knew of no reason why engines could not be "popped" inside the roundhouse; that openings could be made in the roof and covers with louvers built over them higher than the roof to permit the steam to escape. The other witnesses testified similarly on the question. We do not believe the general feasibility of emitting steam through openings of the roof of defendant's roundhouse while testing the safety valves of locomotives therein was a matter so exclusively within the knowledge of a combustion engineer or other expert on steam as to preclude the testimony of plaintiff and his witnesses, as stated, who had many years' experience in working in and around steam engines while in such roundhouses. Tatum v. Gulf M. & O. R. Co., 359 Mo. 709, 723, 223 S.W.2d 418; Malone v. Gardner, 362 Mo. 569, 242 S.W.2d 516; Hiatt v. Wabash R. Co., 334 Mo. 895, 69 S.W.2d 627. The point is overruled.

Defendant next asserts that it was error to admit Rule 44 of the union contract of employment over its objection that it did not apply to testing safety valves. The record shows the following from the plaintiff's testimony:

"Q. (By Mr. Hullverson) I want to show you Exhibit No. 11. What is that? A. That is the rules and agreement which we work under.

"Q. And that is with whom? With what company? A. With the Wabash Railroad.

"Q. I want to refer you to Rule 44. Is that one of the rules under which you work? A. Yes, sir. Let me put my specks on, Rule 44—you want me to read it?

"Q. Yes, read it.

"Mr. Ely: No. Pardon me; not yet.

"Mr. Hullverson: All right. I offer in evidence Rule 44, your Honor.

"Mr. Ely: I object to it because that applied to work that is done in roundhouses. This plaintiff has already testified that the popping of valves was never done in the roundhouse.

"Mr. Hullverson: Oh, no, he hasn't so testified.

"Mr. Ely: He worked there twenty-five years and said they never did pop a valve in the roundhouse.

"The Witness: I didn't say that.

"Q. I thought you did.

"The Witness: No, sir. He asked me how long I had popped valves and I said about twenty-five years.

"Mr. Hullverson: We will get to that later. I offer at this time this rule, your Honor.

"Mr. Ely: May I ask the witness one question along that line just on that one point?

"The Court: All right.

"Q. (By Mr. Ely) Didn't you say, Mr. Scneder, that that work of popping valves was always done outside? A. Yes, it has been done outside because the foreman requested it, because there was no provision ever made for it, even though that rule has been in force, I believe, since '39.

"Q. They never did pop valves inside the roundhouse? * * * A. They have done it.

"Q. They have? A. They have.

"Mr. Ely: All right.

"Mr. Hullverson: I desire to read this rule in evidence. 'Rule 44: Protection to Employees: Employees will not be required to work on engines or cars outside of shops during inclement weather if shop rooms or pits are available'.

"Mr. Ely: Will you read the rest of the rule?

"Mr. Hullverson: That is the only part—

"Mr. Ely: You haven't read the whole rule. You have to read the whole one.

"Mr. Hullverson: * * * I am going to mark this and to emphasize it. I will read it all; be happy to do so. I will read it again: 'Protection to Employees: Employees will not be required to work on engines or cars outside of shops during inclement weather if shop rooms or pits are available. This does not apply to work in engine cabs or emergency work on engines or cars as set out or attached to trains or light repairs to cars on repair tracks'. Have you heard what I am reading?

"The Witness: Yes. * * *.

"Q. (By Mr. Hullverson): You have heard me read that rule. I will ask you if the work you were doing comes under that rule? A. Yes, sir.

"Mr. Ely: Wait a minute. I object to that as calling for a conclusion of the witness.

"Mr. Hullverson: All right.

"Mr. Ely: Pardon me, I move the jury be instructed to disregard that question.

"The Court: The motion is sustained and the question and answer stricken and the jury instructed to disregard it.

"Mr. Hullverson: I offer in evidence the rule.

"Mr. Ely: May I see it, please? It has already been admitted in evidence. I would like, if your Honor please, to have these pencil marks to be erased.

"Mr. Hullverson: I am not going to hand it to them.

"Mr. Ely: All right".

It is true that at the close of plaintiff's case plaintiff's counsel stated he wanted the Rule Book to be in evidence. Defendant's counsel reminded him that it was already in evidence, and that while he had objected to all of it, he had requested the reading of the whole rule. However, the record speaks for itself, as above shown.

 It is apparent from the foregoing excerpts from the record that defendant first made objection to Rule 44 on the ground that it applied to work done in roundhouses. Without waiting for a ruling on the objection, counsel for defendant requested leave to ask the witness a question bearing on his objection, and

upon receiving an answer contrary to his grounds of objection, said: "All right". Thereupon, counsel for plaintiff started to read the rule, and counsel for defendant asked that the whole of it be read. No ruling on the objection was thereafter made or requested. On the contrary, when the plaintiff was asked by his attorney if the rule applied to his work in question, the defendant objected solely on the ground that the question called for a conclusion of the witness, and the answer of the witness was stricken and withdrawn from the jury's consideration. Under the circumstances, defendant did not properly preserve its objection at the trial. Fletcher v. Ringo, Mo.Sup., 164 S.W.2d 904, 906. Furthermore, even though the violation of Rule 44 may not have been the direct cause of the casualty, it was not improper to admit the rule, as pleaded, as explanatory of the physical conditions surrounding the casualty. Griffith v. Gardner, 358 Mo. 859, 217 S.W.2d 519, 526. It appears, therefore, that it was not prejudicial error to admit Rule 44 in evidence.

■ "Defendant next asserts that the court erred in refusing defendant's Instructions A and C. Instruction A would have told the jury that it was its duty to determine whether the company Rule 44 "was promulgated" for the safety of the employees working on engines, and whether plaintiff and other employees of defendant doing similar work "intended or generally understood" that it applied to testing safety valves on steam locomotives, and if not, then the defendant could not be found guilty of violating the rule. It was the purpose and effect of this instruction to submit to the jury whether it applied to plaintiff's work. Although it was pleaded and proved, plaintiff's main instruction did not submit the rule or its violation, nor did defendant's main instruction, or any other instruction except defendant's Instruction A. It is not pleaded or otherwise claimed that Rule 44 is ambiguous. No contrary custom was pleaded. It is not denied that it is a part of the rules of employment exist-

ing between the defendant and its employees. It was, therefore, a matter of law for the determination by the court as to whether, under the evidence, the rule applied to the work in which plaintiff was engaged when injured. It was not proper to determine that issue by submitting to the jury the purposes of "promulgating" the rule or what was the "intent and general understanding" of its employees regarding it. It was said in Stuart v. Dickinson, 290 Mo. 516, 555, 235 S.W. 446, 458: "A great deal of testimony was received ostensibly for the purpose of showing the methods of operating trains under the rules, but as a matter of fact it took a much wider scope, going in effect to the meaning of the rules themselves as understood by the witnesses. The rules in question, however, constituted a written contract between the receiver and his employes; their construction, therefore, devolved exclusively upon the court." We hold that it was not error to refuse Instruction A.

■ Instruction C told the jury that if it found the work of testing safety valves on steam locomotives could not be performed in the roundhouse with reasonable safety to the employees, and that such work could be performed outside the roundhouse with reasonable safety to the employees, then even if the defendant required the work to be done outside, defendant could not be found guilty of negligence in requiring the work to be done outside. Although not a verdict-directing instruction, it was properly refused by the court because it did not submit the controverted duty, if any, of defendant *to make* the roundhouse reasonably safe for such work.

■ Next the defendant makes the point that in cross-examining a doctor testifying for the defendant, plaintiff's counsel was permitted to read from an article written by a doctor who was unidentified by anyone as an authority. The particular inquiry was as to the possible necrosis of the neck of the femur that might result from the fracture of that

bone. In the cross-examination of Dr. Funsch, a medical witness for the defendant, plaintiff's counsel produced an article in the Journal of American Medical Association to which the witness said he was a subscriber. The doctor said he did not know of the author of the article. Counsel read from the article a statement that "Aseptic necrosis of the head of the femur was present in 32.6 percent of the patients that obtained union. 59 percent of the hips was non-union." Witness was asked if he thought that such percentages were reasonable. Objection was made to the reading from the article without evidence of the identity of the author or that the witness had knowledge of him. The objection was overruled. The witness answered that such percentages were not according to his own experience. In a similar manner counsel quoted from the article pertaining to arthritis in fractured hips. On redirect examination the defendant's counsel examined the witness further and at length on the contents of the article and used it in direct examination of another medical expert witness for the defendant.

It is the general rule in Missouri that approved text books on technical subjects may be used, not as independent evidence, but as a basis for testing the witnesses's knowledge on cross-examination. Hemminghaus v. Ferguson, 358 Mo. 476, 490, 215 S.W.2d 481; Wiener v. Mutual Life Ins. Co. of New York, 352 Mo. 673, 681, 179 S.W.2d 39; MacDonald v. Metropolitan St. R. Co., 219 Mo. 468, 491, 118 S.W. 78. The author was not properly identified in the instant case. However, it was fully brought out by the cross-examination and redirect examination that impacted fractures of the femur were expressly excluded from the statistics on healing as furnished by the author. We believe no prejudicial error was committed by the trial court in permitting the use of the medical articles as described.

■■ Defendant's last point is that the "verdict is excessive". It is strongly contended that the amount is not warranted by the evidence and is not in conformity with prior decisions of this court. It is not contended that the amount is such as to indicate bias and prejudice on the part of the jury, but it is urged if the defendant be denied any other relief sought by this appeal, that the court order a substantial remittitur as a condition of affirmance. The point as so assigned is no more than a claim of an "honest mistake of the jury in the weighing of evidence pertaining to the nature and extent of an injury and assessing compensation therefor", whereas, a claim that the amount indicates bias and prejudice may go to the jury's finding on the issue of liability. Jones v. Pennsylvania R. Co., 353 Mo. 163, 172, 182 S.W.2d 157, 159. The defendant here reiterates its assertion that the sole, proximate cause of plaintiff's injury was his own negligence, but asserts that if not so held, the amount of any damages assessed in his favor "should be reduced by the percentage of the negligence leading to the injury, which was attributable to plaintiff himself".

■■ When the point of mere excessiveness of the verdict is made in an appellate court in a negligence case, the nature and scope of review enters a field of inquiry unlike all other points reviewable. Not only does the appellate court therein examine into the jury's determination of the extent of the injuries and the reasonable compensation therefor, and may fix the maximum allowable therefor, but in cases arising under the Federal Employers' Liability Act, the reviewing court must further find whether any contributory negligence pleaded was established as a matter of law, and if so, whether the damages determined have properly been diminished thereby. Nevertheless, it has long been the settled law in this state that courts have the power to keep verdicts within the limit of fair and reasonable compensation and mere excessiveness of the verdict may be cured in the appellate court by a remittitur. Jones v. Pennsylvania R. Co., supra; Sofian v. Douglas, 324 Mo. 258, 265, 23 S.W.2d 126; Counts v. Thompson, 359 Mo. 485, 503, 222 S.W.

2d 487; Hill v. St. Louis Public Service Co., 359 Mo. 220, 230, 221 S.W.2d 130.

Obviously, there is no rule by which such an excessive verdict may be reduced with exactitude. The question that immediately arises is: "By what standard is the amount excessive"? The rule has been set up and established that "in determining the issue of an excessive verdict we do not weigh the evidence but consider only the evidence and inferences most favorable to the plaintiff and to the jury's verdict which has had the approval of the trial court." Pierce v. New York Central R. Co., Mo.Sup., 257 S.W.2d 84, 90. As to amount, the only standard available is a reasonable degree of uniformity in verdicts approved for comparable injuries. The theory is that when the size of such a verdict is merely not supported by the evidence beyond a certain maximum amount arrived at by consideration of prior decisions of the court in cases wherein the injuries are comparable, the plaintiff is permitted to elect between a remittitur of the excess or to submit to a retrial. Nothing in the Federal Employers' Liability Act precludes this practice in our courts. Counts v. Thompson, supra.

Plaintiff's evidence tended to show that he was 59 years of age, had worked steadily for over 25 years for defendant as a machinist; was earning between three and four hundred dollars a month; had sixteen years' life expectancy; that he fell from the runway along the boiler of the engine to a sloping concrete base of a water tower, throwing him on his side; that he was not able to arise from his prone position, and was taken to the hospital. There it was learned that he had sustained a fracture of his right femur, hip or thigh bone; impacted comminuted fracture of right calcaneus (bone of the ankle); that the latter extended into and affected the ankle joint; the heel bone was flattened; the injury to the ankle caused severe pain and is progressive and permanent; · that by an operation on the hip a Smith-Peterson nail was driven into

the femur and is still there. Both fractures have healed but the pain and suffering continue; there is evidence that the plaintiff's right arch is much flatter than the left; his heel bone is thickening, affecting the muscles and tendons of the foot and the maintenance of its stability; he will "always have pain in the foot" because of the overgrowth of bone into the joint; that the pain in the hip is increasing, arthritis is likely to set in at the ankle joint and a possible necrosis of the head of the right femur. Numbness of the plaintiff's knee and right leg occurs at times, muscular cramps develop and hot packs are necessary to reduce the pain and swelling in his hip and back. When the plaintiff gets down he "can hardly get up". He was confined in the hospital for three months. Thereafter he got around on crutches for a month or six weeks and then for a like period by the use of a cane. Eight months after the injuries, he returned to the shop but on the daylight shift. He was forced to quit about ten days before the trial because of a strain in the handling of a boom on the job a few weeks previously.

Plaintiff's physician was asked: "Q. What do you look for in this hip joint with regard to disability? A. Pain that he has already complained of; insecurity of the hip joint and inability to get about on that lower extremity is going to progress and he is going to have episodes when it is much worse and episodes when it may be better, and during these episodes you are going to look for possible complications. * * *.

"Q. Doctor, I have stated to you this man had a fractured hip, as you described from your examination and from what you know of this man. Let's say from your examination of this man what would you say as to his ability to continue in doing machinist work? * * * A. I don't think he could work as a machinist because of disability in his foot and hip".

There was substantial and uncontradicted evidence of contributory negligence on the plaintiff's part in his failure

to make proper use of his flashlight immediately preceding his fall. The court properly instructed the jury as to the effect of any contributory negligence on the amount of any damages found in plaintiff's favor. It was the duty of the jury to find negligence on plaintiff's part under the evidence, and to have diminished the amount of plaintiff's damages thereby as instructed.

 Thus, to recapitulate, the plaintiff sustained a fracture extending into his ankle bone, a fracture of the femur, suffered much pain, lost eight months' time at $300 or $400 a month; will probably be permanently crippled in the right ankle, which will affect the stability of that foot and prevent him from resuming his trade as a machinist, and he may possibly have necrosis of the hip joint, and increasing arthritis in his foot. On the other hand, both fractures have healed and he returned to work after eight months following the accident and worked to within about ten days before the trial. There is no evidence that he will be unable to work in some line that will not require him to stand.

In Triplett v. Beeler, Mo.Sup., 268 S.W. 2d 814, plaintiff's injuries consisted of a fracture and displacement of the sixth and seventh vertebrae, a nerve filament injury to the cervical nerve and extending to the right arm, causing a loss of motion of the neck of 10 to 20 percent, and loss of 50 percent of muscle power in his right hand and two fingers of that hand. During his stay in the hospital the plaintiff wore a cast or rubber collar for about six months; would not be able to perform any labor until six months after the trial. The stiffness of his neck was permanent and calcium had formed in the vertebrae since the injury. He suffered much pain, incurred medical expenses of $450, and his earning capacity had been reduced. The verdict was for $30,000, and was upheld on appeal.

In Curry v. Thompson, Mo.Sup., 247 S.W. 2d 792, 31 A.L.R.2d 1225, the plaintiff, a railroad employee, was thrown from a boxcar, landing on his back. He was 21 days in the hospital; X-rays showed fractures of two ribs on the right side and of the transverse process of two lumbar vertebrae. There was a contusion of the kidney and surrounding tissues sufficient to cause blood in the urine. He sustained bruises, suffered great pain in the back and lost 24 pounds. There was evidence that he would be permanently unable to resume work as a switchman, although he had made several attempts to do so. However, it was shown among after-trial facts that plaintiff did resume his work and had worked 42 days out of 56 since the trial. The verdict of $40,000 was reduced by remittitur in the trial court to $30,000, and by this court to $25,000.

In Osburn v. Kansas City Southern Ry. Co., 360 Mo. 813, 230 S.W.2d 856, a verdict for $40,000 was reduced in the trial court to $25,000, and in this court to $15,000. The verdict was not subject to reduction by plaintiff's contributory negligence as in cases under the Federal Employers' Liability Act. The plaintiff's injuries in brief were to the neck and back, in conjunction with preexisting arthritic conditions, a loss of earning power and a permanent disability from resuming his work as a railway mail clerk.

In Hilton v. Thompson, 360 Mo. 177, 227 S.W.2d 675, the plaintiff was 54 years old, an employee of defendant, and the action was brought under the Federal Employers' Liability Act. After the accident he was in the hospital for two months, walked with crutches or a cane for six months thereafter; was permanently injured in the back; suffered much pain in his back and right leg; had difficulty in sleeping; lost earning power and had sustained a comminuted fracture of the right pubic bone and compression of some of the inter-vertebral discs. His physical recovery had been substantial and had enabled him to resume work. The verdict of the jury was $37,000. This court required a remittitur of $7,000.

The verdict in the present case purports to be in such amount as would be reason-

able and fair compensation to the plaintiff for the injuries and damages sustained by him, diminished in proportion to the amount of negligence attributable to the plaintiff. As we have held, there was, as a matter of law, some contributory negligence established in the evidence. Considering the verdict here of $40,000 under such circumstances, as compared with the aforementioned cases and others wherein comparable injuries were involved, and considering the contributory negligence established, it is our conclusion that the present verdict is excessive by $10,000.

If the plaintiff will, within ten days from the date hereof, remit the sum of $10,000, a judgment of $30,000 will be affirmed as of the date the original judgment was rendered; otherwise, the judgment will be reversed and the cause remanded for retrial.

LEEDY, Acting P. J., and STONE, Special Judge, concur.