Ray R. AMOS, Respondent,

v.

**SOUTHERN RAILWAY COMPANY, a**
**Corporation, Appellant.**

No. 44108.

Supreme Court of Missouri.

Division No. 2.

Dec. 13, 1954.

Kramer, Campbell, Costello & Wiechert, East St. Louis, Ill., Fordyce, Mayne, Hartman, Renard & Stribling, F. W. Schwarz, St. Louis, for (defendant) appellant.

Elledge & Johnson, Winston-Salem, N. C., Charles E. Gray, St. Louis, for (plaintiff) respondent.

WESTHUES, Commissioner.

Plaintiff filed this suit in the Circuit Court of the City of St. Louis, Missouri, to recover damages for personal injuries alleged to have been sustained when he was struck· by a chain and block while he was attempting to loosen the chain which was being used in connection with a derrick in replacing a bridge near Walnut Cove, North Carolina. A trial resulted in a verdict for plaintiff in the sum of $108,000. Defendant appealed.

The suit was based on the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq. Plaintiff claimed that at the time

he was injured he was an employee of the Southern Railway Company. The principal contention of the defendant at the trial was, and on this appeal is, that plaintiff was not an employee of the Southern.

It is necessary to state the facts in detail. Plaintiff was an employee of the Norfolk and Western Railroad Company from 1916 to April, 1946, when he accepted a job as a joint car inspector at Walnut Cove, N. C., where the Norfolk and Western and the Atlantic and Yadkin Railway Company had stations. Plaintiff was paid by the Norfolk and Western but the Atlantic and Yadkin contributed to the payment of plaintiff's wages on the basis of the amount of labor performed for that company. It was an admitted fact that plaintiff was the joint employee of these two companies. Plaintiff's claim that he was an employee of the Southern was based on the theory that on the day plaintiff was injured, he was requested to work on a bridge under the supervision of a Mr. Kerr, a wreck-master of the Southern. The bridge in question was part of the tracks of the Atlantic and Yadkin. Plaintiff also introduced evidence as to the financial and business relationship of the Southern with the Atlantic and Yadkin.

(At this point we may dismiss the Norfolk and Western from our discussion. Hereinafter the Southern Railway Company will be referred to as Southern and the Atlantic and Yadkin as Yadkin or A. & Y.)

There was not sufficient work at Walnut Cove to keep plaintiff busy as joint car inspector so he was required to perform other labor such as unloading freight, throwing switches, and in general helping about the yards. Plaintiff testified that on several occasions he was required to do odd jobs for the Southern. On one occasion, he was instructed to go to Mt. Airy to inspect a car. Plaintiff said he rode there in a cab of a Southern engine, inspected the car, and reported to the Southern at Greensboro that the car could not be moved unless repairs were first made. He testified that he was furnished with Southern defect cards on which to make reports for Southern cars; that he saw Southern engines and Southern crews at Walnut Cove; that he received supplies from the Southern to make repairs on cars. Plaintiff's testimony was that a short time before April 16, 1949, material for the new bridge was delivered and that he helped unload it at the old bridge; that Mr. Kerr of the Southern was in charge and gave orders as to what was to be done. On April 16, 1949, the day plaintiff was injured, two derricks of the Southern were taken to the point where the new bridge was to be placed in position. It had been assembled and the old bridge had been taken out. The crew was using the two derricks to set the new bridge in place when plaintiff was injured. Plaintiff testified that he went to the bridge because he considered it his duty. Note plaintiff's evidence on this point:

"A. I met Mr. McArthur—I had already started up there as per my instructions several months ago to do anything that I could do to assist either road or all roads there, and I had crossed the Highway 311 that crosses the Southern track west of Walnut Cove station, and I met Mr. McArthur in that vicinity. He didn't ask me, he told me to go down and assist in relaying signals on car No. 1 and it was steaming bad; by that I mean the fireman was having trouble keeping up enough steam to make the lift with.

"Q. Did you go on over and start relaying signals? A. I went up there; I reported to the engineer, and Mr. McArthur had told me to, what he had told me to do, and he says O.K.

"Q. What engineer? A. Mr. George Page.

"Q. Was he the engineer of derrick car No. 1? A. He was.

"Q. Who was the fireman on that derrick car? A. I don't remember the gentleman's name.

"Q. Who is Mr. Page employed by? A. The Southern Railroad.

"Q. This derrick car, was that one that was stationed in Greensboro and used by the Southern? A. Yes."

The Mr. McArthur in the above-quoted testimony was the roadmaster of the Yadkin. "The Southern track west of Walnut Cove station," referred to by the witness, was actually the track of the Yadkin. The witness in his evidence often referred to the track as the Southern track. It was an admitted fact that the crews operating the derricks were Southern employees and the derricks belonged to the Southern. Defendant claimed that the derricks and crews were leased to the Yadkin and the rent was paid by Yadkin. Plaintiff testified that Mr. Kerr of the Southern directed the work at the bridge. Witnesses for the defendant testified that both Mr. Kerr and Mr. McArthur directed the work and that McArthur was in general charge. Plaintiff's testimony was that he relayed signals on derrick No. 1; that in moving the boom, the engineer on the derrick failed to pull his cable far enough to clear the tool or flat car and that it became entangled and had to be loosened; that he called to the engineer to stop and "I told him, I hollered at him and told him to, 'Whoa, you have hooked something on the tool car,' and he stopped; I said, 'George, I will go out and unloosen the chain,' and he said, 'O.K.' Well, the derrick there is a little bit higher above the freight car, and I climbed down, walked out there approximately eight to ten feet from the west end of the car.

"Q. Where is the car—where was the tool car in relation to the derrick car? A. It was on the east end of the derrick car.

"Q. In other words, it was the next car? A. It was coupled to the derrick car.

"Q. To the derrick car, back from the bridge to the east? A. Yes.

"Q. All right. A. When I had come out to the chain where it was hooked, I taken hold of it and it was tight and I couldn't move it.

"Q. Now, then Mr. Amos, right there could you tell us where the boom on this derrick car was at that time or where the chain had been hooked, was it north or was it south of there? A. It was south of where the chain was hooked, approximately.

"Q. Had the boom swung on over and the chain was hooked back here? A. That is right.

"Q. And was the chain that was hooked running at an angle up through the boom? A. Yes, sir, the cable.

"Q. Then when you couldn't get it undone, what did you do? A. I turned back around and I hollered at Mr. Page and asked me (him) to give me some slack, signaled like that to lower.

"Q. Did you also holler at him? A. Yes, sir, I hollered at him and gave him a signal, too.

"Q. All right. Then what did you do? A. I turned back to watch the chain when it would become loose and when I looked down at the chain the block struck me beside the head, and that is the last I remember."

The work plaintiff claimed he was doing was work supposed to have been done by the Southern crew.

We shall now relate some of the facts shown by the evidence with reference to the business and financial connection of the Southern with the Yadkin. E. K. McArthur, roadmaster for the A. & Y. in 1949, and now assistant division engineer for the Southern, testified that he began working on the railroad known as the Atlantic and Yadkin in 1916; that it was then operated by the Southern; that in 1923, the Southern "turned it loose to the A. & Y., I believe it was in 1923." The evidence disclosed that the Yadkin owned two boxcars, one flat car, six cabooses, five camp cars, and no engines. All of the engines and other cars except the number mentioned were leased by the Southern to the Yadkin. The yearly rental

was fixed at 4% of the value of the property. All of the trains of the Yadkin were made up by Southern crews and delivered to crews of the Yadkin for transportation. The Southern owned all of the capital stock of the A. & Y. To qualify members of the board of directors, Southern transferred a share of stock to the individual members of the board who in turn would endorse the share and return it to the Southern. E. L. Faulconer, President, General Manager, and Treasurer of the A. & Y., now Assistant Vice-President of the Southern Railway system, testified that he was a member of the board of the A. & Y. With reference to his qualifications as a shareholder and director, he testified as follows:

"Q. You know, as a matter of fact, you were given your share so that you would be qualified to sit as a director?

"A. Yes, sir.

"Q. You endorsed that share of stock back in blank to the Southern Railroad; did you not?

"A. Yes, sir.

"Q. And they held the share of stock?

"A. Correct."

Payment of the bonds of the A. & Y. was guaranteed by Southern. Southern paid $105,000 in interest and also paid bonds maturing on April 1, 1949. The A. & Y. had notified Southern on March 1, 1949, that it could not pay the bonds. On April 12, 1949, four days before plaintiff was injured, the board of directors of the A. & Y. met and adopted a resolution of which a part reads as follows: " 'Resolved, that it is deemed advisable and for the benefit of the company that the company be dissolved and that its assets be distributed in liquidation to the Southern Railway Company as owner of all the company's outstanding bonds and capital stock; * * *.' " The Southern applied to the Interstate Commerce Commission for approval of the transaction. On November 25, 1949, the Commission granted the ap-

plication and the Atlantic and Yadkin corporation was dissolved. The mortgage held by the Southern, due to mature on April 1, 1949, provided that in case of default in the payment of interest and bonds " 'then and in every such case forthwith, and without any lapse of time after such default, the Yadkin Company, its successors and assigns, shall, upon demand of the Trustee, forthwith surrender to the Trustee the actual possession of, and the Trustee personally or by its agents or attorneys shall be thereupon entitled forthwith to enter upon and take possession of all and singular the said Mortgaged property and premises, with the appurtenances hereby conveyed, or so intended to be, and the Trustee so having and holding said premises and property shall be authorized to use, operate as a railroad and manage said property and premises, in the name of the Yadkin Company, by such Receiver, agents, servants, and attorneys, as the Trustee may select.' "

■ Was a jury justified in finding that plaintiff at the time he was injured an employee of the Southern? We think so. It is not this court's duty to weigh the evidence. That is for a jury. Plaintiff testified that he was directed to work at the bridge; that when he reported for duty, he was assigned to the task of relaying signals because a member of the Southern crew who was supposed to do the relaying had other duties to perform; that on other occasions he had done odd jobs for the Southern. In addition to that, it is significant that four days before plaintiff was injured, the board of directors of Yadkin had passed a resolution to dissolve the company and to transfer all of its assets to Southern. This transfer no doubt had been in the making for some time. As noted above, on March 1, the Southern had been notified that the Yadkin could not meet its obligations. The evidence was that the bridge where the plaintiff was injured and other bridges on the Yadkin road were being rebuilt or strengthened so that larger engines could be used on the road. It must have been known that all of this expense was to be absorbed by Southern. It may be inferred that the improvements were being

made in contemplation of Southern's taking over. Furthermore, the Yadkin corporation did not have a board of directors as provided by the state laws. The statute of North Carolina requires a member of the board of directors to be a bona fide holder of stock. Section 60–18, Chapter 60, General Statutes of N.C., 1950, provides in part that "No person shall be a director or president unless he shall be a stockholder owning stock absolutely in his own right and qualified to vote for directors at the election at which he shall be chosen; * * *." For cases on the subject, see 19 C.J.S., Corporations, § 726, p. 60.

■ Defendant insists that plaintiff's evidence was insufficient to justify a finding that Southern exercised such control over the Yadkin so that the separate entity of Yadkin could be disregarded. Many cases were cited to support that theory. We need not decide that question because even if defendant's position were correct, plaintiff's evidence was sufficient to support a finding that when injured he was in fact working for Southern. The case was submitted on that theory to a jury. The evidence as to the financial and business relationship of the two companies tended to support plaintiff's claim that Southern was interested in rebuilding the bridge and that plaintiff was doing work as a member of the Southern crew.

We hold that under the evidence in this case, a jury was justified in finding that plaintiff was in fact an employee of the Southern at the time he was injured. Baltimore & O. S. W. R. Co. v. Burtch, 263 U.S. 540, 44 S.Ct. 165, 68 L.Ed. 433; Hamilton v. Southern Ry. Co., 200 N.C. 543, 158 S.E. 75, loc. cit. 82 (1, 2); Cummings v. Illinois Central R. Co., Mo.Sup., 269 S.W.2d 111, loc. cit. 116 (1–3); Malone v. Gardner, 362 Mo. 569, 242 S.W.2d 516, loc. cit. 520 (2, 3).

■ Defendant says the trial court erroneously excluded exhibit T offered in evidence to support defendant's theory that the A. & Y. Company was independent of the Southern. The exhibit was an order made by the I. C. C. on April 21, 1933. The order was made in a rate case wherein a shipper of stone in carload lots and a number of railroads, including the Southern and the Atlantic and Yadkin, were interested parties. The order of the Commission would be of no value without a showing of all the circumstances surrounding that case and it certainly would be improper to retry the issues in the rate case. We hold the trial court did not err in excluding the exhibit. Vicksburg, S. & P. Ry. Co. v. Godwin, 5 Cir., 14 F.2d 114.

Defendant contends the verdict of $108,-000 is grossly excessive. In the brief no contention is made that the verdict was the result of bias and prejudice. All the defendant asks is for this court to require a remittitur. Note what defendant says in its brief: "The verdict is grossly excessive; it calls for drastic remittitur."

A review of the evidence has convinced us that the defendant's contention must be sustained. Plaintiff, at the time of injury, was 49 years old, earning about $350 per month. He had been railroading about thirty years. Plaintiff when struck by the block and chain fell from the car to the ground, a distance of 12 to 15 feet. He was unconscious for five days. He was treated at a hospital where he remained for 18 days. Plaintiff's right hand was fractured or broken at the wrist and the left side of his face was severely injured; the jawbone was broken and there was a cut on the side of his face extending from the ear to the jaw leaving a scar about 4 inches in length. Other parts of plaintiff's body were bruised. His arm was in a cast for about 6 weeks. The jawbone was set or wired together. Plaintiff suffered the usual pains accompanying such injuries. He has a stiffness in the wrist resulting from the injury to such an extent that he cannot make a fist or use the hand in climbing or doing any heavy work. Treatment of this ailment did not result in any improvement. This injury is permanent. The injury to the left side of plaintiff's face and jaw caused partial paralysis on the right side of the face. This was due to a nerve injury. Because of this injury, when plaintiff eats, food trickles out of the right side of

his mouth. Plaintiff also stated that since the injury he becomes dizzy when he bends over to pick up objects; that on several occasions not thinking of this he has stooped over and because of dizziness he has fallen.

Plaintiff's evidence also showed that on October 10, 1949, after the injury in April, he returned to work and held his job as a car inspector until February, 1950. He stated that he could not climb on boxcars and in other respects could not fulfill his duties; that he asked for other work but his request was not granted. On February 28, 1950, when an operation was performed on plaintiff's wrist, a piece of bone was removed. According to plaintiff, this operation resulted in more stiffness in his wrist. Plaintiff stated he frequently has headaches and pains in his wrist, is nervous, and is frequently unable to sleep.

Medical evidence was introduced substantiating plaintiff's complaints that the use of his right hand had been permanently impaired; that he had partial paralysis of the right side of his face. The doctors attributed plaintiff's dizziness to concussion. With reference to its permanency and that of nervousness, Dr. Robert J. Mueller who did not treat plaintiff when injured but who examined plaintiff on December 13, 1950, testified as follows:

"Q. Now, then, assuming that this condition has existed from April 16, 1949 up to date, from what would you have an opinion as to its permanency based on reasonable medical certainty?

"A. Well, I would like to answer the question in two parts, if I might. In the first place, with a post-concussional cerebral syndrome that continues over this period of time, you begin to doubt that there is going to be much sustained improvement; it is unusual that it would continue this period of time, but these conditions occasionally will occur. In regard to the neurosis, there is no way that I know of saying whether—how long this may last. You can use as a working basis that since it has lasted this long, it is probably going to continue for some time to come,

but no one can lay down a hard and fast law on that."

It is evident, however, that plaintiff will be able to work at a gainful occupation. He did work for the railroad from October to February after the injury, earning $350 to $400 per month. He also worked at a filling station and at a restaurant as a dishwasher. He is far from being totally disabled.

This court has frequently stated rules concerning the question of requiring remittiturs in cases where the verdicts were deemed excessive. See Cruce v. Gulf, Mobile & Ohio R. Co., 361 Mo. 1138, 238 S.W. 2d 674, loc. cit. 680–682 (12, 13) (14–17) (18, 19) (20), and Counts v. Thompson, 359 Mo. 485, 222 S.W.2d 487, loc. cit. 495, 496 (15, 16) (17–19) (20) (21–23). We shall decide the question of excessiveness in this case in conformity with the principles of law stated in these two cases. Giving plaintiff Amos the benefit of all favorable evidence in the record concerning his injuries, we find that his injuries are not comparable to those sustained by Cruce or Counts in the cases cited supra. In the Counts case, the verdict of the jury was for $165,000; the trial court ordered a remittitur of $25,000 and this court ordered an additional remittitur of $60,000, which reduced the amount of the judgment to $80,-000. In the Cruce case, the trial court had ordered a remittitur of $12,500, the verdict being $52,500, and this court affirmed the judgment for $40,000. It cannot be said that injuries in one case are the same as those in some other case. There are always some differences. The injuries and loss sustained by Amos as shown by the record before us are somewhat the same as the injuries and loss of the plaintiff in O'Brien v. Louisville & Nashville R. Co., 360 Mo. 229, 227 S.W.2d 690, and the plaintiff in Abernathy v. St. Louis-San Francisco Ry. Co., Mo., 237 S.W.2d 161. In the O'Brien case, a verdict of $100,000 was by remittiturs of $45,000 in the circuit court and $20,000 in this court reduced to $35,000. In the Abernathy case, a verdict of $85,000 was reduced in the trial court to $45,000 and this court ordered a further reduction to $35,000. See

also Lesch v. Terminal R. R. Ass'n of St. Louis, Mo., 258 S.W.2d 686; Blew v. Atchison, T. & S. F. Ry. Co., Mo., 245 S.W.2d 31.

Considering the allowances in the above cases and plaintiff's injuries as shown by the record, we deem that $38,000 would be a liberal sum to compensate plaintiff for the loss he has sustained. If, therefore, plaintiff will within 15 days enter a remittitur in the sum of $70,000, a judgment for $38,000 is hereby affirmed as of the date of the verdict. Otherwise, the case is reversed and remanded. It is so ordered.

PER CURIAM.

The foregoing opinion by WESTHUES, C., is adopted as the opinion of the court.

BOHLING and BARRETT, CC., concur.

LEEDY, Acting P. J., ELLISON, J., and BENNICK and BROADDUS, Special Judges, concur.